# JEFFREY L. GOLDBERG, P.C.
## ATTORNEYS AT LAW

JEFFREY L. GOLDBERG

ERIC SANDERS
MANAGING ATTORNEY

DANIEL B. GAZAN (1967-2001)
SUSAN PENNY BERNSTEIN

2001 MARCUS AVENUE, SUITE S160
LAKE SUCCESS, NEW YORK 11042

WWW.JLGOLDBERGPC.COM

PHONE (516)775-9400
FAX (516)775-4477

JENNIFER RIEHL
HADIYAH S. REEVES
HARSAHIB KAUR
PARALEGALS

August 10, 2009

Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

     Re: Rachel Rodriguez v. City of New York, et al.,
        Docket No.: 05 CV 5117 (KAM)(SMG)

Dear Judge Matsumoto:

  We represent the Plaintiff in the above-mentioned matter. We respond in opposition to Defendants' CITY; ELOISE M. ARCHIBALD; PATRICK ZWEIBEL and KAREENA SALADEEN PATEL'S Motion in Limine. Plaintiff also motions this Court to disqualify the New York City Law Department from the dual representation of defending both the municipality Defendant CITY and the individual parties, Defendants' ELOISE M. ARCHIBALD; PATRICK ZWEIBEL and KAREENA SALADEEN PATEL as their positions are adverse and such a representation contravenes the ethical rules regarding conflicts of interest. *See* Dunton v. County of Suffolk, 729 F.2d 903 (2d Cir. 1984)(Holding the representation by county attorney created conflict of interest and deprived officer of fair trial). *See also* The Association of the Bar of the City of New York Committee on Professional and Judicial Ethics, Topic: Organization as a Client: Special considerations For a Government Lawyer, Formal Opinion Number 2004-03, 2004 WL 3241602, See Exhibits 1-3. [1]

## Exhibits

- No. 9: FRE 801(d)(2)(B), 801(d)(2)(C), 803(1), 803(5), 803(6), See Exhibit 4
- No. 27 FRE 702, 704, 705, 803(1), 803(4), 803(5), 803(6), See Exhibit 5
- No. 33 FRE 803(8, See Exhibit 6
- No. 35 FRE 803(3), See Exhibit 7
- No. 36 FRE 803(1), 803(3), 803(5), 803(6), See Exhibit 8
- No. 38 FRE 801(d)(2), 803(1), 803(3), 803(5), 901(70, 902(1), 902(2), See Exhibit 9
- No. 28 FRE 801(d)(2), See Exhibit 10

---

[1] The Court needs to intercede and compel the New York City Law Department to produce Defendants' ELOISE M. ARCHIBALD; PATRICK ZWEIBEL and KAREENA SALADEEN PATEL'S waiver regarding the conflict of interest. However, in the face of an actual conflict, the Court should disqualify the New York City Law Department and compel Defendant CITY to provide Defendants' ELOISE M. ARCHIBALD; PATRICK ZWEIBEL and KAREENA SALADEEN PATEL with separate conflict counsel.

- No. 37 FRE 803(3), See Exhibit 11

**Hearsay**

It is Plaintiff's position that her conversation with Sergeant Rosado is not being offered for the truth of the matter asserted but, purely for her state of mind at the time of the conversation. Further, based upon that conversation, Plaintiff began to seek advice from the National Latino Officer's Association, the Patrolman's Benevolent Association and legal counsel regarding the November 19, 2004, incident. In any event, such conversation is admissible under FRE 801(1), 803(3) and/or 807. Similarly, the same goes for the conversations with Lieutenant Wahlig, and Police Officer Richard Mendez.

**Discovery Deficiency**

Despite the representations of Counsel that the Plaintiff's Psychological File was produced in its complete form, the witnesses say otherwise. See Exhibit 12.

**Closing**

Therefore, the Plaintiff's position is that the above-mentioned Defendants' Motion in Limine should be denied in Toto and its Motion to Disqualify the New York City Law Department should be granted.

The Court is thanked in advance for its consideration.

Sincerely,

Eric Sanders (ES0224)

Enclosures

cc:    Assistant Corporation Counsel Jesse D. Capell, Esq.
       New York City Law Department
       100 Church Street, Room 2-170
       New York, N.Y. 10007

**EXHIBIT 1**

Westlaw.

729 F.2d 903
**(Cite as: 729 F.2d 903)**

☞

United States Court of Appeals,
Second Circuit.
Emerson W. DUNTON, Jr., Plaintiff-Appellee,
v.
COUNTY OF SUFFOLK, STATE of NEW YORK,
Suffolk County Police Department, County of Suf-
folk, State of New York, Robert Pfeiffer, Angela
Pfeiffer, "Richard Roe," "James Doe" and "John
Poe," the latter being fictitious names of real per-
sons, members of the Suffolk County Police De-
partment, Defendants,
Angela Pfeiffer, and Robert Pfeiffer, Defendants-
Appellants.
**Nos. 542, 543, Dockets 83-7384, 83-7814.**

Argued Nov. 17, 1983.
Decided Feb. 28, 1984.

Civil rights action was brought against police of-
ficer, his wife, and county. The United States Dis-
trict Court for the Eastern District of New York, Is-
rael Leo Glasser, J., entered judgment against of-
ficer and his wife, and they appealed. The Court of
Appeals, Meskill, Circuit Judge, held that: (1) rep-
resentation by county attorney of the police officer
and the county created conflict of interest and de-
prived officer of fair trial, and (2) where federal
claims against wife were patently meritless and in-
substantial, state claims against her should have
been dismissed along with the federal claims.

Reversed and remanded.

See also D.C., 580 F.Supp. 974.

West Headnotes

**[1] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General

78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
        78k1351      Governmental      Ordinance,
Policy, Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
        (Formerly 78k206(3), 78k13.7)
Municipality may avoid liability for alleged viola-
tions of civil rights by showing that employee was
not acting within scope of his official duties, be-
cause his unofficial actions would not be pursuant
to municipal policy. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ☞1354**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1354 k. In General. Most Cited Cases
        (Formerly 78k207(1), 78k13.7)
Municipal employee may partially or completely
avoid liability for violations of civil rights by show-
ing that he was acting within scope of his official
duties; if he can show that his actions were pursu-
ant to official policy, he can shift part of his liabil-
ity to municipality. 42 U.S.C.A. § 1983.

**[3] Attorney and Client 45 ☞21.5(2)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k21.5 Particular Cases and Problems
                    45k21.5(2) k. Government, Em-
ployment by or Representation Of. Most Cited Cases
Representation by county attorney of county police
officer and county in civil rights action in which it
was alleged that police officer violated plaintiff's
civil rights by assaulting him created conflict of in-
terest and deprived police officer of fair trial where

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
**(Cite as: 729 F.2d 903)**

county attorney undermined police officer's good-faith immunity defense based on officer's contention that assault occurred within scope of his employment by asserting that the officer was not acting under color of state law but rather as an irate husband in assaulting the plaintiff. ABA Code of Prof.Resp., Canons 5, 9.

**[4] Attorney and Client 45 ☜⟶19**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k19 k. Disqualification in General. Most Cited Cases
Violation of Canons of Code of Professional Responsibility calling for exercising independent judgment on behalf of a client and avoiding any appearance of impropriety provides ample grounds for disqualifying attorney. ABA Code of Prof.Resp., Canons 5, 9.

**[5] Attorney and Client 45 ☜⟶20.1**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k20.1 k. In General. Most Cited Cases
(Formerly 45k20)
Where conflict of interest between attorney and client is serious and disqualification might be warranted, district court is under a duty to ensure that client fully appreciates his situation.

**[6] Attorney and Client 45 ☜⟶20.1**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k20.1 k. In General. Most Cited Cases
(Formerly 45k20)

When litigant's statutorily appointed counsel is acting against litigant's interests because of conflict that litigant has not been informed of and cannot be expected to understand on his own, litigant is not receiving fair trial.

**[7] Attorney and Client 45 ☜⟶21.5(2)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k21.5 Particular Cases and Problems
                    45k21.5(2) k. Government, Employment by or Representation Of. Most Cited Cases
In civil rights action in which it was alleged that police officer violated plaintiff's civil rights by assaulting him, trial court had duty to advise the officer that representation by the county attorney could cause conflict of interest where actual conflict existed when attorney defended county on ground that police officer's conduct was not under color of state law, thereby undermining officer's good-faith immunity defense. 42 U.S.C.A. § 1983.

**[8] Attorney and Client 45 ☜⟶21.10**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k20 Representing Adverse Interests
                45k21.10 k. Disclosure, Waiver, or Consent. Most Cited Cases
Police officer did not waive objection to multiple representation of himself and county by county attorney in civil rights action in which it was alleged that police officer violated plaintiff's civil rights by assaulting him even though officer failed to object before or during trial where letter written by county attorney to officer suggesting that he contact outside counsel did not say anything about attorney's taking basic position throughout litigation adverse to officer's interest.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

Page 3

**[9] Federal Courts 170B ⇌242.1**

170B Federal Courts
   170BIII Federal Question Jurisdiction
     170BIII(D) Pleading
       170Bk242 Sufficiency of Allegations
         170Bk242.1 k. In General. Most Cited Cases
   (Formerly 170Bk242)
Federal subject-matter jurisdiction does not exist where claim set forth in the pleading is plainly unsubstantial, a category that includes claims that are obviously without merit.

**[10] Federal Courts 170B ⇌18**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
         170Bk18 k. Validity or Substantiality of Federal Claims and Disposition Thereof. Most Cited Cases
Even if federal claims are discovered to be patently meritless only after trial begins, once that discovery is made, state claims must be dismissed along with federal ones.

**[11] Federal Courts 170B ⇌18**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
         170Bk18 k. Validity or Substantiality of Federal Claims and Disposition Thereof. Most Cited Cases
Where federal civil rights claims against wife of police officer who assaulted plaintiff after plaintiff allegedly began making improper advances toward the wife were patently meritless and insubstantial in that there was no evidence that wife was acting under color of state law when she filed criminal complaint against plaintiff, state claim against wife for malicious prosecution should have been dismissed along with the federal claims. 42 U.S.C.A. § 1983.

**\*905** Charles T. DeMartin, Hauppauge, N.Y. (DeMartin, Kranz, Davis & Hersh, Hauppauge, N.Y., of counsel), for defendant-appellant Robert Pfeiffer.

Robert T. Rinear, West Babylon, N.Y. (Leonard Symons, Young, Symons & Rinear, West Babylon, N.Y. of counsel), for defendant-appellant Angela Pfeiffer.

Stanley L. Shapiro, Setauket, N.Y., for plaintiff-appellee.

Before OAKES and MESKILL, Circuit Judges, and NEAHER,[FN*] District Judge.

      FN* Honorable Edward R. Neaher, United States District Judge for the Eastern District of New York, sitting by designation.

MESKILL, Circuit Judge:

Robert Pfeiffer appeals from a judgment entered against him after a jury trial in the United States District Court for the Eastern District of New York, Glasser, *J.*, awarding Emerson Dunton, Jr. $10,000 compensatory damages and $10,000 punitive damages on a state law battery claim. Angela Pfeiffer appeals from a judgment entered against her in the same trial, awarding Dunton $5,000 compensatory damages and $20,000 punitive damages for malicious prosecution. We reverse the judgment against Robert Pfeiffer and remand for a new trial and reverse the judgment against Angela Pfeiffer and remand to the district court with instructions to dismiss the complaint.

I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

Defendant-appellant Angela Pfeiffer attended a retirement party for a fellow employee on the evening of May 20, 1981. As the party broke up, plaintiff-appellee Emerson Dunton, Jr., a co-worker and attendee, accompanied Ms. Pfeiffer to her car. The accounts of the subsequent events differ; Ms. Pfeiffer claims that Dunton began making improper advances while they were seated in her car, while Dunton asserts that Ms. Pfeiffer willingly participated in the maneuvers. Defendant-appellant Robert Pfeiffer, Angela's husband and also a Suffolk County police officer, came upon the scene in his patrol car, threw Dunton out of Ms. Pfeiffer's car, struck him repeatedly and left him lying in the parking lot. Dunton suffered non-disabling and non-permanent injuries from the incident.

Dunton was arrested after Angela Pfeiffer filed a criminal complaint on June 18, alleging third degree sexual abuse in violation of N.Y.Penal Law § 130.55 (McKinney 1975). When the matter did not come to trial by November 16, Dunton moved to dismiss on the ground that the sixty day limit for trial, N.Y.Crim.Proc.Law § 30.30 (McKinney 1981 & Supp.1983), had been exceeded. The motion was denied and Dunton moved for reconsideration. On December 23, the Suffolk County district court concluded that it had erred in computing the sixty day period and that sixty-seven days were actually chargeable to the prosecution. Accordingly, it granted the motion to dismiss. The Appellate Division affirmed. *See* App. at 1342-47.

**\*906** On August 17, 1981, Dunton filed this action against Suffolk County, the Suffolk County Police Department and the Pfeiffers seeking $50 million compensatory damages, $50 million punitive damages and reasonable attorney's fees. Dunton alleged violations of 42 U.S.C. § 1983 (Supp. III 1979) [FN1] by Officer Pfeiffer and his patrol car partner for the actions in the parking lot, by a desk sergeant for failing to make a report, and by Officer Pfeiffer and other members of the police department for covering up and conspiring to cover up the incident.

He also alleged that the Pfeiffers violated 42 U.S.C. §§ 1983 and 1985 (Supp. II 1978) [FN2] by conspiring to cover up the incident with Angela's complaint of sexual abuse. Finally, he alleged pendent state claims of assault and battery against Robert Pfeiffer and false arrest and malicious prosecution against Angela Pfeiffer.

> FN1. 42 U.S.C. § 1983 (Supp. III 1979) states in pertinent part:
>
> > Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
>
> FN2. 42 U.S.C. § 1985(3) (Supp. II 1978) states in pertinent part:
>
> > If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

By local law, Suffolk County provides for the representation of its employees sued under section 1983. *See* App. at 1325-28. Robert Pfeiffer and Suf-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

folk County were represented in this action by the office of the Suffolk County Attorney (County Attorney). An indication that this joint representation might create a conflict came in a form letter from the County Attorney to Robert Pfeiffer dated August 25, 1981 suggesting that because "plaintiff has alleged that [Pfeiffer] acted in [his] personal capacity and/or has demanded punitive damages" and because of possible counterclaims, Pfeiffer should contact private counsel "for such additional advice as may be appropriate." App. at 1199-200. Angela Pfeiffer retained her own attorney.

The County Attorney's answer to Dunton's complaint included an affirmative defense that Robert Pfeiffer was acting in good faith pursuant to his official duties and responsibilities. However, it was the last time that the defense contended that Pfeiffer was acting in good faith as a police officer. The County Attorney told the jury in opening statements that Pfeiffer "acted as a husband, not even as an officer," App. at 135. Similarly, he told the jury in closing statements that it was obvious Pfeiffer "was acting as an irate husband rather than a police officer," App. at 989, and that he acted "with the human spirit as a husband, not really as an officer," App. at 995. This was clearly the County Attorney's theory of the case, as he made similar statements to the trial judge. See App. at 98-102, 779-81.

All of Dunton's claims were dismissed by the court as meritless except for the section 1983 claim against Robert Pfeiffer and the state law claims of battery against Robert Pfeiffer and malicious prosecution against Angela Pfeiffer. The jury found Robert Pfeiffer not liable under section 1983, but awarded $10,000 compensatory and $10,000 punitive damages on the battery claim. Angela Pfeiffer was held liable for $5,000 compensatory and $20,000 punitive damages for malicious prosecution.

Robert Pfeiffer then made a series of post-trial motions relating to the County Attorney's conflict of

interest. While the district court acknowledged that there was a conflict, it denied the motions on the ground that Pfeiffer was not prejudiced thereby. It stated that even if Pfeiffer had *907 been shown to be acting under color of state law, damages would still have been awarded for the unjustified battery, and that punitive damages would also have been awarded in any event. See 580 F.Supp. 974, 975-76 (E.D.N.Y.1983).

II

Robert Pfeiffer appeals on the ground that the Suffolk County Attorney failed to represent his interest adequately because of the attorney's conflicting representation of Suffolk County. Specifically, Officer Pfeiffer claims that it was in his interest to assert his immunity from section 1983 liability based on good faith actions within the scope of his employment. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 & n. 30, 102 S.Ct. 2727, 2738-39 & n. 30, 73 L.Ed.2d 396 (1982); Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Pfeiffer contends that the attorney undermined the good faith immunity defense by repeatedly stating that Pfeiffer acted not as a police officer but as an "irate husband."

Municipalities commonly provide counsel for their employees and themselves when both municipality and employee are sued. The Suffolk County Attorney's representation of Officer Pfeiffer here was mandated by statute. See Suffolk County Local Law No. 30 (1981), reprinted in App. at 1325-28. Prior to 1978, such representation would not have caused a conflict because municipalities were not "persons" subject to section 1983 liability. See Monroe v. Pape, 365 U.S. 167, 187-92, 81 S.Ct. 473, 484-86, 5 L.Ed.2d 492 (1961). Thus, a municipality would have had no reason to give an employee less than full representation.

[1][2] However, since the Supreme Court's decision

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities can be held liable under section 1983 for employees' actions taken pursuant to municipal policy. After *Monell* the interests of a municipality and its employee as defendants in a section 1983 action are in conflict. *See Van Ooteghem v. Gray*, 628 F.2d 488, 495 n. 7 (5th Cir.1980), *aff'd in part, vacated in part on other grounds*, 654 U.S. 304 (5th Cir.1981) (en banc) (per curiam), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982). A municipality may avoid liability by showing that the employee was not acting within the scope of his official duties, because his unofficial actions would not be pursuant to municipal policy. The employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties. If he can show that his actions were pursuant to an official policy, he can at least shift part of his liability to the municipality. If he is successful in asserting a good faith immunity defense, the municipality may be wholly liable because it cannot assert the good faith immunity of its employees as a defense to a section 1983 action. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

[3] Because of the imminent threat of a serious conflict, disqualification would have been appropriate here even before any proceedings began. *See Shadid v. Jackson*, 521 F.Supp. 87, 88-90 (E.D.Tex.1981) (granting motion to disqualify in virtually identical case because of "high potential for conflicting loyalties"). *Cf. Armstrong v. Mc-Alpin*, 625 F.2d 433, 444-46 (2d Cir.1980) (en banc) (disqualification appropriate when conflict will taint a trial by affecting attorney's presentation of a case), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). This conflict surfaced when the County Attorney stated that Pfeiffer was not acting under color of state law but rather as an "irate husband." This was a good defense for the county, which eventually was dis-

missed from the action. However, it was not in the best interest of Pfeiffer, who was ultimately found liable in his individual capacity. Pfeiffer's failure to object to the multiple representation before or during trial did not constitute a waiver. As a layman, he could not be expected to appreciate his need to prove a good faith defense. Furthermore, he was never advised that his *908 counsel would take positions directly contrary to his interest.

[4] The County Attorney's multiple representation in this case was inconsistent with his professional obligation to Officer Pfeiffer. *See Hafter v. Farkas*, 498 F.2d 587, 589 (2d Cir.1974). It was also inconsistent with Canons 5 and 9 of the ABA Code of Professional Responsibility.[FN3] A violation of Canons 5 and 9 of the Code, which call for exercising independent judgment on behalf of a client and avoiding any appearance of impropriety, provides ample grounds for disqualifying an attorney. *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). As soon as the County Attorney began to undermine Officer Pfeiffer's good faith immunity defense by stating that Pfeiffer acted as an "irate husband" and not as a police officer, he was not only failing to act as a conscientious advocate for Pfeiffer, but was acting against Pfeiffer's interest. The seriousness of this conflict made disqualification appropriate. *Shadid v. Jackson*, 521 F.Supp. at 88-90.[FN4]

> FN3. Canon 5, "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," includes the following:
>
> EC [Ethical Consideration] 5-1 ... Neither [a lawyer's] personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.
>
> ....
>
> EC 5-15 If a lawyer is requested to un-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

dertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests, and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests.

EC 5-16 ... [B]efore a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent.

DR [Disciplinary Rule] 5-101(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

....

DR 5-105(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C) [which permits multiple representation with full disclosure where all interests

can be adequately represented].

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C).

(footnotes omitted).

In addition, Canon 9, "A Lawyer Should Avoid Even the Appearance of Professional Impropriety," has been invoked by this Court in attorney conflict cases. *See, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 234-35 (2d Cir.1977).

The new Model Rules of Professional Conduct, adopted by the ABA House of Delegates on August 2, 1983 but not yet adopted by the Bars of the State of New York or the Eastern District of New York, contain similar provisions and language. *See* Rules 1.7, 8.4.

FN4. We need not create here a *per se* rule that disqualification is automatic in conflicts of this nature, although considering the overall responsibility of the court to supervise the ethical conduct of the Bar, *see, e.g., In re Taylor,* 567 F.2d 1183, 1191 (2d Cir.1977), such a rule might indeed be appropriate. *Cf. Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984) (in civil attorney conflict case, it is "more important that unethical conduct be prevented than that [a party] have an unfettered right to counsel of its choice").

[5] Where a conflict is serious and disqualification

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

might be warranted, the district court is under a duty to ensure that the client fully appreciates his situation. This Court has stated that "[w]hen a potential or actual conflict of interest situation arises, it is the court's duty to ensure that the attorney's client, so involved, is fully aware of the nature of the conflict and understands the potential threat to the protection of his interests." *In re Taylor,* 567 F.2d 1183, 1191 (2d Cir.1977).

*909 [6][7] There are at least two reasons why a court should satisfy itself that no conflict exists or at least provide notice to the affected party if one does. First, a court is under a continuing obligation to supervise the members of its Bar. E.g., *In re Taylor,* 567 F.2d at 1191; *see Musicus v. Westinghouse Electric Corp.,* 621 F.2d 742, 744 (5th Cir.1980) (per curiam) (district court obligated to take measures against unethical conduct occurring in proceedings before it). Second, trial courts have a duty "to exercise that degree of control required by the facts and circumstances of each case to assure the litigants of a fair trial." *Koufakis v. Carvel,* 425 F.2d 892, 900-01 (2d Cir.1970); *see* ABA Code of Judicial Conduct, Canon 3(A)(4). When a litigant's statutorily appointed counsel is acting against the litigant's interests because of a conflict that the litigant has not been informed of and cannot be expected to understand on his own, the litigant is not receiving a fair trial. *Cf. Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (divided loyalties of counsel may create due process violation).

In holding that the trial court had a duty to inform Pfeiffer of the conflict, we in no way excuse the conduct of the other attorneys here. Attorneys are officers of the court, *Clark v. United States,* 289 U.S. 1, 12, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933), and are obligated to adhere to all disciplinary rules and to report incidents of which they have unprivileged knowledge involving violations of a disciplinary rule. ABA Code of Professional Responsibility, DR 1-102(A), 1-103(A); *see In re Walker,* 87

A.D.2d 555, 560, 448 N.Y.S.2d 474, 479 (1st Dep't 1982) (as officers of court, attorneys required to notify parties and court of error in court order). The County Attorney had to know of the serious conflict his multiple representation created, *see, e.g.,* App. at 1163, and knew or should have known that he could not fulfill his ethical obligations to the county without seriously undercutting Pfeiffer's legal position. The plaintiff's attorney should also have been aware of the problem and should have called it to the attention of the court. *See Estates Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 345 F.Supp. 93, 98 (S.D.N.Y.1972) ("[T]hose attorneys representing other parties to the litigation were obligated to report relevant facts [regarding conflict of interest of opponent's attorney] to the Court ....") (citing DR 1-102).

[8] Neither do we believe that Pfeiffer waived his objections to multiple representation by failing to object before or during trial.[FN5] The letter to Pfeiffer only said that there was a possibility of punitive damages, personal liability or counterclaims, and only suggested that Pfeiffer contact outside counsel. It did not say anything about the most serious conflict, that the County Attorney would take a basic position throughout the litigation which was adverse to Pfeiffer's interest. *See* App. at 1083-84 (Affidavit of R. Pfeiffer). Pfeiffer presumably knew little or nothing about the law of attorney conflicts and could not be expected to discern the nature of the conflict. He would naturally rely on his attorney to protect him. *See Wood v. Georgia,* 450 U.S. at 265 n. 5, 101 S.Ct. at 1100 n. 5 (lawyer on whom conflict-of-interest charge focuses is unlikely to concede that his actions were improper).

> FN5. We assume arguendo, without deciding the question, that the district court could allow Pfeiffer to waive his objections to multiple representation given a serious conflict such as the instant one.

The district court acknowledged that there was a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

conflict in Pfeiffer's representation but denied the motion for a new trial in the mistaken belief that the conflict was not prejudicial. We do not agree. If Pfeiffer's first trial had been fair, he might have escaped liability altogether. The county had agreed to indemnify Pfeiffer for compensatory damages. App. at 1160. If the jury found that Pfeiffer was acting in good faith as a police officer, it might not have awarded punitive damages. We believe that because the jury never had a chance to consider Pfeiffer's good faith immunity defense, Pfeiffer did not receive the fair trial *910 to which he was entitled. *See Turner v. Gilbreath,* 3 Kan.App.2d 613, 599 P.2d 323 (1979) (reversing trial court's failure to grant new trial); *see also Jedwabny v. Philadelphia Transportation Co.,* 390 Pa. 231, 135 A.2d 252 (1957) (affirming trial court's decision to grant new trial), *cert. denied,* 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958); *In re Estate of Richard,* 4 Kan.App.2d 26, 602 P.2d 122 (1979) (violation of Code of Professional Responsibility that prevents a fair trial constitutes reversible er- ror).

The conflict of interest not only prejudiced Pfeiffer, it may also have resulted in an improper benefit to the municipal defendants. The claim that Pfeiffer acted under color of state law was never presented to the jury in the trial below. If Pfeiffer had the opportunity to contend that he did act under color of state law but was immune from liability based on good faith actions within the scope of his duties, Suffolk County or the Police Department may still have been found liable under section 1983. While Dunton did not cross-appeal on this issue, this Court may consider questions of law not raised by the parties in order to prevent injustice. *See Hormel v. Helvering,* 312 U.S. 552, 556-57, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Because the liability of the County and the Police Department were not determined in a fair trial, failure to reinstate those parties in the action would work an injustice on Dunton, who did not create the conflict of interest

at issue here.

Accordingly, we vacate the judgment against Robert Pfeiffer and the orders dismissing Suffolk County and the Suffolk County Police Department and remand the entire cause of action against them for a new trial.[FN6]

> FN6. The original complaint also included causes of action against fictitiously named members of the Suffolk County Police Department. Dunton, however, never amended his complaint to supply those parties' real names. Because there was never any adjudication involving these parties, our decision does not affect them.

III

Angela Pfeiffer raises for the first time on appeal the issue of subject matter jurisdiction. She contends that the pendent state claims should have been dismissed when the federal claims against her were dismissed as frivolous.

Although we would not normally consider an issue not raised below, lack of subject matter jurisdiction may be raised at any time and indeed must be raised *sua sponte* by the court. Fed.R.Civ.P. 12(h)(3); *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939).

The trial court ruled that it could properly exercise pendent jurisdiction over Ms. Pfeiffer because "the Federal claims against [her] were not dismissed until well into the trial stage of this action." 580 F.Supp. at 977. Apparently the court predicated this holding on a line of cases suggesting that there should be no dismissal of the pendent state claim if "substantial time and energy have been expended looking toward the resolution of a dispute *that plaintiffs were entitled to bring in a federal court.*" *Rosado v. Wyman,* 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970) (emphasis ad-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

ded). But that rule applies only if the plaintiff was entitled to bring his civil rights actions in a federal court in the first place.

[9][10] Federal subject matter jurisdiction does not exist "where the claim set forth in the pleading is plainly unsubstantial," a category that includes claims that are "obviously without merit." *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933). Thus, the district court has an obligation to examine the substantiality of the federal claims throughout the litigation. Even if the federal claims are discovered to be patently meritless only after the trial begins, once that discovery is made the state claims must be dismissed along with the federal ones. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 727, 86 S.Ct. 1130, 1138, 1139, 16 L.Ed.2d 218 (1966) (pendent jurisdiction can only be invoked when federal\***911** claims are substantial, and substantiality issue "remains open throughout the litigation"); *Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 254 (2d Cir.1979) ("Even where substantial time and resources have been expended in the trial of an action in federal court, pendent state claims must be dismissed if it later is determined that there never existed a federal claim sufficient to invoke the jurisdiction of the federal court.").

[11] The federal claims against Angela Pfeiffer were patently meritless and insubstantial. There is no evidence in the record that Angela Pfeiffer was acting under color of state law and plaintiff's counsel even admitted that no cause of action was being asserted against Ms. Pfeiffer under section 1983. App. at 786-87. There is no evidence in the record to support a conspiracy charge under section 1983. *See* App. at 938-39. Finally, a section 1985(3) complaint must allege an "invidiously discriminatory animus" aimed at depriving an individual of equal protection of the laws or equal privileges and immunities. *Griffin v. Breckenridge,* 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971); *Orshan v. Anker,* 489 F.Supp. 820, 823-24

(E.D.N.Y.1980). Plaintiff adduced no evidence to show discriminatory animus and no such allegation appeared on the face of the complaint.[FN7]

> FN7. Even were the federal claims here substantial, this Court has stated that it may be an abuse of discretion to try a pendent state claim when the underlying federal claims are dismissed for failure to state a claim and no prejudice would result from requiring plaintiff to try his case in state court. *Nolan v. Meyer,* 520 F.2d 1276, 1280 (2d Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).

Thus, we hold that the federal civil rights claims were so insubstantial that the district court did not have jurisdiction to retain the state claims. Were we to hold otherwise, litigants could move their state claims into federal court by the simple device of joining groundless federal claims unsupported by any facts. *See Morpurgo v. Board of Higher Education,* 423 F.Supp. 704, 718 (S.D.N.Y.1976) (pendent jurisdiction fails when federal civil rights claim insubstantial); *Burnett v. McNabb,* 565 F.2d 398, 400 (6th Cir.1977) (per curiam) ("Transfer of jurisdiction to the federal courts cannot be accomplished by ... filing an unsubstantial action under 42 U.S.C. § 1983, coupled with a prayer for the exercise of pendent jurisdiction.").[FN8]

> FN8. Our decision here does not preclude Dunton from bringing his action in state court. Because the action is not being terminated by voluntary dismissal, failure to prosecute or judgment on the merits, Dunton may sue in state court within six months of the date of this action's dismissal. N.Y.Civ.Prac.Law § 205(a) (McKinney Supp.1983). *See Gaines v. City of New York,* 215 N.Y. 533, 539, 109 N.E. 594, 596 (1915) (Cardozo, J.) (dismissal of first action for want of subject matter jurisdiction tolled statute during pendency of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.2d 903
(Cite as: 729 F.2d 903)

action); *Brown v. Bullock,* 17 A.D.2d 424, 427, 235 N.Y.S.2d 837, 840 (1st Dep't 1962) (per curiam) (pendency of action commenced in Southern District of New York and dismissed for lack of diversity jurisdiction would toll statute).

Accordingly, we reverse and remand the cause against Angela Pfeiffer to the district court with instructions to dismiss.[FN9]

> FN9. In order to recover for malicious prosecution, plaintiff must show that the prosecution was terminated in his favor. When the termination is not on the merits, the issue becomes whether the failure to proceed implies that there were no reasonable grounds for the prosecution. *Russo v. New York,* 672 F.2d 1014, 1019 (2d Cir.1982), *vacated and remanded on other grounds,* 721 F.2d 410 (2d Cir.1983) (per curiam). A dispute as to the factual circumstances involving the termination of the prosecution is to be resolved by the jury; otherwise, the issue of favorable termination is one of law. *See Russo,* 672 F.2d at 1020; *Loeb v. Teitelbaum,* 77 A.D.2d 92, 98, 432 N.Y.S.2d 487, 491-92 (2d Dep't 1980), *modified,* 80 A.D.2d 838, 439 N.Y.S.2d 300 (2d Dep't 1981).

> While we need not reach the merits of this issue because of our dismissal on jurisdictional grounds, we note that the trial court incorrectly charged the jury that favorable termination had been established as a matter of law. *See* App. at 1055. The jury should have heard evidence as to whether the 67 days charged to the prosecution implied that there were no reasonable grounds for Angela Pfeiffer's sexual abuse complaint. A party who alleges malicious prosecution should have in the record facts to support a "no reasonable grounds" argument.

In addition, the facts of this case may show that favorable termination had *not* been established. First, Dunton filed his malicious prosecution claim on August 17, 1981, long before the termination of the criminal action on December 28, 1981. App. at 2, 1343. Because the complaint must be read as of the date it is filed, we question how favorable termination could have been shown as of August 17 when there was no termination until four months later. Second, Dunton's complaint was filed exactly 60 days after Angela Pfeiffer's June 18 sexual abuse complaint. *See* App. at 2, 1342. The sexual abuse action was terminated because more than 60 days were charged to the prosecution in bringing the case to trial. *See* N.Y.Crim.Proc.Law § 30.30 (McKinney 1981 & Supp.1983). But as of the date of Dunton's action, the 60 day limit could not have been exceeded.

C.A.N.Y.,1984.
Dunton v. Suffolk County, State of N.Y.
729 F.2d 903

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT 2**

Westlaw.

748 F.2d 69
(Cite as: 748 F.2d 69)

**H**

United States Court of Appeals,
Second Circuit.
Emerson W. DUNTON, Jr., Plaintiff-Appellee,
v.
COUNTY OF SUFFOLK, STATE OF NEW
YORK, Suffolk County Police Department, County
of Suffolk, State of New York, Robert Pfeiffer, An-
gela Pfeiffer, "Richard Roe," "James Doe" and
"John Poe," the latter being fictitious names of real
persons, members of the Suffolk County Police De-
partment, Defendants,
Angela Pfeiffer, and Robert Pfeiffer, Defendants-
Appellants.
Nos. 542, 543, Dockets 83-7384, 83-7814.

Oct. 30, 1984.

Upon recall of mandate and sua sponte reconsidera-
tion of an earlier decision, 729 F.2d 903, the Court
of Appeals, Meskill, Circuit Judge, held that in-
terests of justice did not warrant reinstatement of a
county as a party in a civil rights action against a
county police officer arising from his assault on the
plaintiff; even though county and its attorney
caused the officer a great injustice by failing to
provide separate counsel for him, it was in no way
responsible for plaintiff's failure to meet his burden
of proof.

Earlier opinion amended.

West Headnotes

**Civil Rights 78 ☞1389**

78 Civil Rights
    78III Federal Remedies in General
        78k1385 Parties
           78k1389 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
    (Formerly 78k232, 78k13.11)

Interests of justice did not warrant reinstatement of
a county as a party in a civil rights action against a
county police officer arising from his assault on the
plaintiff; even though county and its attorney
caused the officer a great injustice by failing to
provide separate counsel for him, it was in no way
responsible for plaintiff's failure to meet his burden
of proof.

**\*69** Before OAKES and MESKILL, Circuit Judges,
and NEAHER,[FN*] District judge.

> FN* Honorable Edward R. Neaher, United
> States District Judge for the Eastern Dis-
> trict of New York, sitting by designation.

MESKILL, Circuit Judge:

We recall the mandate and *sua sponte* reconsider
our decision in *Dunton v. County of Suffolk,* 729
F.2d 903 (2d Cir.1984), without hearing oral argu-
ment, following a rather unusual set of circum-
stances.

**I**

Familiarity with the underlying action is presumed.
On June 29, 1984, long after the mandate issued,
the County of Suffolk and the Suffolk County Po-
lice Department (collectively, the County) filed
with this Court a petition for a writ of prohibition to
the district court. The County's objective was to bar
its reinstatement as a party defendant at the retrial
which we had directed in our instructions on re-
mand. The County essentially argued that, notwith-
standing the prejudice that it had caused to defend-
ant Robert Pfeiffer by failing to provide him with
independent trial counsel, it could not be reinstated
as a party to the trial because it had never been a
party to the appeal. Noting that the plaintiff had not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

748 F.2d 69
(Cite as: 748 F.2d 69)

appealed the district court's order dismissing*70 the County,[FN1] the County reasoned that it was not subject to the jurisdiction of this Court.

> FN1. At the close of all of the evidence, the district court dismissed the claims against the County because it agreed that the plaintiff had failed to meet his burden of proof and, therefore, as a matter of law had failed to present a question for the jury. The dismissal, of course, was actually a directed verdict in favor of the County. *See* Fed.R.Civ.P. 50(a).

We recognized that the County had raised a creditable challenge and that our earlier decision deserved reexamination. But we also recognized that the extraordinary writ sought was not the proper vehicle for achieving that end. We should not bar the district court from attempting to comply with our own mandate. Nevertheless, in an attempt to resolve the problem without wasting judicial resources, we offered an alternative that could provide the County the relief it sought.

Identifying the gravamen of the County's petition as a plea to reconsider our initial decision, we considered the petition to include as alternative relief a motion for leave to file out of time a motion to intervene in the Pfeiffers' appeal, a motion to recall the mandate to the district court and a motion to request rehearing with a suggestion for rehearing *en banc. In re County of Suffolk,* No. 84-3058 (2d Cir. July 18, 1984). The motion to file motions out of time was granted and the motion to intervene was considered filed and the motion was granted. By separate order, we granted permission for the motion for rehearing to be filed and recalled the mandate. *Dunton v. County of Suffolk,* No. 83-7814 (2d Cir. July 18, 1984). The petition for a writ of prohibition was denied. *In re County of Suffolk,* No. 84-3058 (2d Cir. July 18, 1984).

The County, in rather cavalier fashion, ignored our

invitation to file a motion for rehearing. Instead, it petitioned the United States Supreme Court for a writ of prohibition to this Court to bar its reinstatement as a party. *In re County of Suffolk,* 469 U.S. 1029, 105 S.Ct. 450, 83 L.Ed.2d 375, (1984).

## II

It seems beyond question that "[s]ince we have the power under 28 U.S.C. [ ] § 1651 to issue mandamus or other extraordinary writs, we obviously have the power to issue less strenuous relief." *In re Tokio Marine & Fire Insurance Co.,* 322 F.2d 113, 117 (5th Cir.1963). Pursuant to that power, we outlined a procedure for the County that would allow it redress. The context in which our alternative was presented was, and remains, the burgeoning caseloads of the federal courts at every level. The overwhelming burdens on the time and resources of our federal courts fairly demand that, in the interest of the integrity of the judicial system and to achieve substantial justice for the parties before the courts, we be ever ready to fashion creative solutions that will help to reduce unnecessarily swollen appellate dockets.

We sought to avoid the imposition of additional burdens on the trial court and the appellate courts. The County was fully aware of both the original appeal and our decision in *Dunton v. County of Suffolk.* Yet it waited until the eve of retrial to raise its present challenge.

Notwithstanding the County's dilatory and insouciant conduct, the most practical and economical solution to this dilemma is for us to reconsider our earlier decision *sua sponte* rather than saddle an already overburdened Supreme Court with this case.

The unusual nature of these circumstances and the realization that injustice would ensue if we simply denied the petition for a writ of prohibition convinced us to recall our mandate. *See, e.g., New-*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

748 F.2d 69
**(Cite as: 748 F.2d 69)**

*house v. Robert's Ilima Tours, Inc.,* 708 F.2d 436, 442 (9th Cir.1983); *Home Life Insurance Co. v. Equitable Equipment Co.,* 694 F.2d 402, 403 (5th Cir.1982); *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 276-80 (D.C.Cir.1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); *see *71 also City of Detroit v. Grinnell Corp.,* 575 F.2d 1009, 1009 (2d Cir.1978). Having recalled our mandate, albeit without the benefit of argument and briefing on rehearing, we conclude that our earlier decision must be modified.

The County certainly caused the trial errors that resulted in our reversal of the verdict against Robert Pfeiffer. However, in dismissing the claim against the County, the district judge correctly stated that the plaintiff presented no evidence against the County. Therefore, even though the County and its attorney caused Robert Pfeiffer a great injustice by failing to provide separate counsel for him, it was in no way responsible for the plaintiff's failure to meet his burden of proof. Consequently, even if it is within our power, given the unique circumstances at trial, to reinstate the County as a party, a question which we do not reach today, the interest of justice does not warrant reinstatement in this case.

We amend our earlier opinion by deleting the last two paragraphs of section II, 729 F.2d at 910, and substitute the following therefor:

Accordingly, we vacate the judgment against Robert Pfeiffer and remand the assault and battery claim against him to the district court for further proceedings.

C.A.2,1984.
Dunton v. Suffolk County, State of N.Y.
748 F.2d 69

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**



NYC Eth. Op. 2004-03                                                              Page 1
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

The Association of the Bar of the City of New York
Committee on Professional and Judicial Ethics

**\*1** TOPIC: ORGANIZATION AS CLIENT: SPECIAL CONSIDERATIONS FOR A GOVERNMENT
LAWYER
Formal Opinion Number 2004-03
September 17, 2004

Digest: Government lawyers are subject to the rules that ordinarily govern the attorney-client relationship, including those governing conflicts of interest and entity representation. This opinion addresses various questions relating to government lawyers' conflicts of interest in civil litigation. The questions may ultimately be analyzed differently for government lawyers than for lawyers who represent private entity clients because of the legal framework within which government lawyers function. Questions such as who the lawyer represents, who has authority to make particular decisions in the representation, and whether the lawyer may represent multiple agencies with differing interests are largely determined by the applicable law. In dealing with government officers and employees, the government lawyer must comply with DR 5-109 and DR 5- 105, as informed by applicable law. If the agency constituents are unrepresented, DR 5-109 requires the lawyer to clarify his or her role, as well as to report any discovered wrongdoing, as described in this opinion. When the government lawyer proposes to represent the constituent, a threshold question is whether the representation will be in the constituent's official or personal capacity. If the constituent would be represented personally, the lawyer must first determine whether the representation is permissible under the conflict of interest rule, DR 5-105, and the lawyer must comply with the rule's procedural requirements in light of the framework described in this opinion.

Code: DR 2-110; DR 4-101; DR 5-101(A); DR 5-105; DR 5-109; DR 7-101; DR 7-102(A); DR 7-104(A)(2); EC 7-7; EC 7-8; EC 7-14.

GOVERNMENT LAWYER CONFLICTS: REPRESENTING A GOVERNMENT AGENCY AND ITS
CONSTITUENTS
Question

What are the ethical obligations of a government lawyer in dealing with potential conflicts of interest (a) among government agency clients; (b) between a government agency and its constituents represented by the government lawyer; and (c) between an agency and unrepresented constituents?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03                                                        Page 2
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

Opinion
1. The Government Lawyer's Enabling Authority.

This opinion addresses conflicts of interest that government lawyers encounter in the exercise of their official duties in the context of civil litigation. Many of the questions faced by government lawyers are similar to those faced by lawyers for private organizations. Therefore, substantial guidance is offered by this Committee's recent opinion on conflicts of interest encountered by lawyers for corporations and other private entities. See ABCNY Opinion 2004-02, Representing Corporations and their Constituents in the Context of Governmental Investigations, -- WL --- (June 2004). However, the questions are often more complex for government lawyers, who may have different sources of legal authority and different obligations from those of lawyers representing private clients.

*2 Other than DR 9-101(B), which relates to "revolving door" issues that arise when lawyers enter or leave public service - issues that this opinion will not address -- no Disciplinary Rule specifically deals with government lawyers' conflicts of interest. Nor does any Disciplinary Rule specifically address issues unique to government lawyers in civil litigation. The provisions of DR 7-103, Performing the Duty of a Public Prosecutor or Other Government Lawyer, relate solely to criminal prosecution. However, an Ethical Consideration, EC 7-14, [FN1] provides general guidance to government lawyers in civil as well as criminal representations. Although EC 7-14 does not specifically address conflicts of interest, it does inform our discussion of this subject.

The starting point for our analysis is DR 5-109, Organization as Client. The keystone concept of DR 5-109(A) is that "a lawyer employed or retained by an organization... is the lawyer for the organization and not for any of the constituents." However, government lawyers are not necessarily "employed or retained" by the organization they represent. Instead, they generally act under specific legal (including statutory or constitutional) authority, as may be elaborated by case law. See, e.g., paragraph 18 of the Preamble and Scope of the American Bar Association's Model Rules of Professional Conduct (government lawyers may have legal authority to exercise authority "concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships"); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97 (2000), Representing a Government Client; EC 7-11 ("responsibilities of a lawyer may vary according to... the obligation of a public officer").

Accordingly, a first step in the analysis of the duties and obligations of a government lawyer is a determination of the specific statutory framework that authorizes the government lawyer to act. The relevant statutory framework for any given government lawyer is, of course, a question of law as to which this Commit-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tee cannot opine. The following discussion is intended, however, as background to indicate the analysis a government lawyer might undertake. The discussion also provides a more specific framework within which to consider the conflicts we address under the Disciplinary Rules.

Reservation of litigating authority to a specific law department is the common model for government at all levels. For example, 28 U.S.C. § 516 reserves to Department of Justice attorneys, under direction of the Attorney General, "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested." Section 547 of Title 28, U.S.C., directs United States Attorneys to "prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned." [FN2] N.Y. Exec. L. § 63(1) gives the New York State Attorney General similar authority to "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any officer thereof which requires the services of attorney or counsel, in order to protect the interest of the state...." At a local level, § 394 of the New York City Charter provides that "the corporation counsel shall be attorney and counsel for the city and every agency thereof, and shall have charge and conduct of all the law business of the city and its agencies and in which the city is interested." Section 501(1) of the N.Y. County Law provides that "[t]he county attorney shall prosecute and defend all civil actions and proceedings brought by or against the county, the board of supervisors and any officer whose compensation is paid from county funds for any official act, except as otherwise provided by this chapter or other law." [FN3] Other statutes pertinent to the government lawyer's authority in a given case may include those authorizing a specific agency to engage in or enforce specific conduct; authorizing a particular agency to sue or be sued; specifying the manner in which certain lawsuits are to be brought; dictating how any judgment is to be paid; local enabling statutes; and so forth.

**\*3** In addition to government law departments, it is equally common that government agencies will employ agency counsel. For one of innumerable examples, N.Y. Pub. Auth. Law § 1265(8) provides that the Metropolitan Transportation Authority shall have power "to retain or employ counsel, auditors, engineers and private consultants on a contract basis or otherwise for rendering professional or technical services and advice." (Emphasis added.) Within New York City, Section 397 of the New York City Charter permits the mayor, on consultation with corporation counsel and the affected agency head, to delegate to any agency "responsibility for the conduct of routine legal affairs of the agency," subject to monitoring by the corporation counsel and the authority of the mayor, on recommendation of corporation counsel, to suspend or withdraw such delegation.

In referring to "the government lawyer," we do not mean to imply that the particular lawyer in question directly enjoys the authority given by statute to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03                                                    Page 4
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

attorney general or other statutorily-designated attorney. The work of most gov-
ernment law departments is carried out by assistants to the statutorily-designated
attorney, operating by delegation of authority in a hierarchical structure. This
opinion assumes that assistant government counsel is operating under properly del-
egated authority, a matter as to which the assistant is required to assure him- or
herself by reference to policies, procedures, and supervisory consultation. As-
sistant government counsel is particularly alerted to the need for supervisory
consultation in addressing questions of professional responsibility, including
those discussed in this opinion.

<h3 style="text-align:center">2. Who is the "Client"?</h3>

Often, a government lawyer employed by a particular agency will have little dif-
ficulty identifying the "client agency." See, e.g., Report by the District of
Columbia Bar Special Committee on Government Lawyers and the Model Rules of Prof'l
Conduct: "[T]he employing agency should in normal circumstances be considered the
client of the government lawyer." However, a government lawyer operating under
general authority to litigate "for the Government," or to "protect the interest of
the state," or to act as "counsel for the city and every agency thereof," will oc-
casionally need to ask, "who is my client?" This question may arise, for example,
in the face of strategic or policy conflicts between the government lawyer and the
represented agency, as well as in the context of inter-agency conflicts.

The Restatement suggests there is no "universal definition of the client of a
government lawyer." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97, comment
(c), Identity of a governmental client. The Restatement notes, without adopting,
general assertions that "government lawyers represent the public, or the public
interest," but ultimately concludes that "[f]or many purposes, the preferable ap-
proach on the question [of who is the client]... is to regard the respective agen-
cies as the clients and to regard the lawyers working for the agencies as subject
to the direction of those officers authorized to act in the matter involved in the
representation...." Id. See RESTATEMENT § 97, comment (f), Advancing a government-
al client's objectives. Ethics opinions also discuss the identity of the govern-
ment client. In ABCNY No. 1990-04 this Committee opined that "[i]f the City is a
litigant, it is important to determine which agency of the City is involved. Where
a governmental body is organized into a number of different departments or agen-
cies, each department or agency should be treated as a distinct person for pur-
poses of the rule which forbids the concurrent representation of one client
against another." In Opinion 1999- 06, we similarly noted that "treating different
governmental departments or agencies as separate clients for the application of
conflicts rules is in keeping with recent opinions treating separate corporate en-
tities in the private sector as distinct clients for conflicts purposes." Other
ethics bodies have reached similar conclusions. For example, D.C. Opinion No. 268
opined that "the identity of the City government client depends upon a number of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

discrete considerations and must be decided on a case-by-case basis." See also
ABA Formal Op. 97-405, Conflicts in Representing Government Entities. The Federal
Bar Association has stated that "the client of the federally employed lawyer... is
the agency where he is employed, including those charged with its administration
insofar as they are engaged in the conduct of the public business," and that "the
lawyer's employment requires him to observe in the performance of his professional
responsibility the public interest sought to be served by the governmental organ-
ization of which he is a part." Op. 73-1, The Government Client and Confidential-
ity, 32 Fed. Bar. J. 71 (1973). See also J.Rosenthal, Who is the Client of the
Government Lawyer?, in ETHICAL STANDARDS IN THE PUBLIC SECTOR, ABA Section of
State and Local Government (P.Salkin ed. 1999).

  *4 Ultimately, the question of who is the government lawyer's client is a ques-
tion of law and not of ethics, and one to which the government lawyer must give
careful consideration in each case. For purposes of this opinion, we will assume
unless otherwise stated that the government agency is for practical purposes the
"client agency." Understanding that the lawyer has a client should serve as a re-
minder that, generally speaking, the government lawyer owes the client agency the
ethical duties that lawyers generally owe entity clients - e.g., duties of compet-
ence and diligence, duties of loyalty and confidentiality, and a duty to communic-
ate with agency representatives to learn their views regarding the representation
and to update them on how the representation is proceeding.

  3. Disagreements Between the Government Litigating Attorney and a Represented
                                Agency.
  Separate from the question of the identity of the government lawyer's client is
the question, "who has authority to make any given decision about the conduct of
the litigation?" This question may be important when the government lawyer has a
substantial disagreement with representatives of the agency client about the con-
duct of the representation. Ordinarily, certain decisions in a representation are
ultimately made by the client after receiving the lawyer's advice - for example,
decisions concerning the objectives of the representation such as whether to ini-
tiate, settle or dismiss litigation - and certain other decisions about how to
achieve the client's objectives are made by the lawyer in light of the client's
interests and objectives. See ECs 7-7 and 7-8. However, the applicable statute may
delegate to the government lawyer some or all decisions that, in a private repres-
entation, would be ordinarily entrusted to the entity client. Thus, the extent to
which a government lawyer may make decisions in litigation on behalf of a govern-
ment agency is both an ethics question and a legal question dependant on the gov-
ernment lawyer's enabling authority. [FN4]

  Where the enabling authority entrusts the government lawyer to make decisions
that would ordinarily be made by the client, the lawyer should act in light of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03                                                                      Page 6
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

relevant public interests and obligations of the client agency and based on appro-
priate consultation with agency representatives. When the enabling authority del-
egates these decisions to agency representatives, the government lawyer should
provide relevant advice. Where appropriate, the government lawyer may vigorously
probe the strengths and weaknesses of the agency's position and offer views about
how the agency should exercise its authority in light of the relevant public in-
terests and legal mandate. EC 7-14 urges the government lawyer to use his or her
discretion to avoid or to recommend against litigation that is "obviously unfair."
Whether a government lawyer may have an ethical obligation to identify and seek a
substantively "just" result in a particular case, even where that may be at odds
with the agency's legally authorized litigation position, is beyond the scope of
this opinion. See, e.g., B. Green, Symposium: Legal Ethics for Government Lawyers:
Straight Talk for Tough Times: Must Government Lawyers "Seek Justice" in Civil
Litigation?, 9 Widener J. Pub. L. 235 (2000).

**\*5** Ultimately, the government lawyer must act consistently with DR 7- 101(A)(1),
Representing a Client Zealously, which provides that, with limited exceptions,
"[a] lawyer shall not intentionally... [f]ail to seek the lawful objectives of the
client...." See also DR 5-101(A), Conflicts of Interest-Lawyer's Own Interests. In
all but the most unusual cases, of course, the government lawyer will be able to
provide competent and diligent representation notwithstanding disagreement with
agency representatives. However, if the government lawyer is not authorized to de-
termine the agency's objectives and because of strong philosophical disagreement
with the agency, the government lawyer is unable to seek to achieve the lawful ob-
jectives determined by the government representative with decision making author-
ity, then the lawyer may be permitted or required to withdraw from the representa-
tion. See DR 2- 110(c)(1)(e) (a lawyer may withdraw if a client "insists, in a
matter not pending before a tribunal, that the lawyer engage in conduct which is
contrary to the judgment and advice of the lawyer but not prohibited under the
Disciplinary Rules"); ABA M.R. 1.16(b) (except in matters pending before a
tribunal, a lawyer may withdraw if the client "insists upon taking action that the
lawyer considers repugnant or with which the lawyer has a fundamental disagree-
ment").

### 4. Inter-Agency Conflicts.

There are any number of circumstances in which a government lawyer may represent
more than one agency in a given litigation or matter, and certain agencies, in-
cluding agencies not directly involved in litigation, may have different or con-
flicting interests in the matter. To what extent does DR 5- 105, Conflict of In-
terest; Simultaneous Representation, govern such conflicts? DR 5-105(B) provides
that

A lawyer shall not continue multiple employment if the exercise of independent

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

professional judgment on behalf of a client will be or is likely to be adversely
affected by the lawyer's representation of another client, or if it would be
likely to involve the lawyer in representing differing interests, except to the
extent permitted under DR 5-105(C).

   The Preamble and Scope of the American Bar Association's Model Rules of Prof'l
Conduct, paragraph 18, notes that government lawyers "may be authorized to repres-
ent several government agencies in intragovernmental legal controversies in cir-
cumstances where a private lawyer could not represent multiple private clients."
On the other hand, W. Josephson and R. Pearce, To Whom Does the Government Lawyer
Owe the Duty of Loyalty When Clients Are in Conflict?, 29 How. L.J. 539 (1986),
take the position that separate agencies must be viewed as separate clients. Ac-
cordingly, Josephson and Pearce would apply DR 5- 105(B) directly.

   While the scope of the government lawyer's authority to represent agencies with
conflicting positions is ultimately a mixed question of law and ethics, the prac-
tical reasons for treating separate agencies like separate clients, and the prac-
tical considerations embodied in DR 5-105(B), suggest that representation of con-
flicting agencies by government lawyers from the same law department is to be
avoided. See, e.g., County of Franklin v. Connelie, 95 Misc. 2d 189, 207 408
N.Y.S.2d 174, 186 (Sup. Ct., Essex County 1978), rev'd on other grounds, 68 A.D.2d
1000, 415 N.Y.S.2d 110 (3d Dep't 1979) ("[t]he Court is convinced, as it also be-
lieves that the Attorney General is, that it was not proper under all of the facts
surrounding this proceeding to have the Attorney General representing all defend-
ants on the arguments before the Court.... Clearly, there were conflicts between
the [APA] and the Division of State Police and the Office of General Services as
the approval of the project wended its way through the labyrinth of bureau-
cracy...."); cf. Chapman v. New York, 193 Misc.2d 216, 220 n.2, 748 N.Y.S.2d 465,
469 n.2 (Ct. of Claims 2002) (suggesting Attorney General may wish to apply for
appointment of independent counsel to challenge constitutionality of private bill
that resuscitated a claim for damages against the state). On the other hand, where
a government lawyer is charged with protecting the interests of the federal gov-
ernment, the state, or a locality, nothing in the disciplinary rules restrains the
government lawyer from attempting to mediate a common position between agencies
with conflicting interests.

          5. "Official Capacity" Parties as Client Agency Constituents.
   *6 In many instances an agency official may be named in his or her "official ca-
pacity" or in some similar designation. The Advisory Committee Notes to the 1961
Amendment of Federal Rule of Civil Procedure 25(d)(1) describe such actions as "in
form against a named officer, but intrinsically against the government or the of-
fice or the incumbent thereof whoever he may be from time to time during the ac-
tion." They include, for example, "actions against officers to compel performance

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

of official duties or to obtain judicial review of their orders... [or] to prevent officers from acting in excess of their authority... [and i]n general... whenever effective relief would call for corrective behavior by the one then having official status and power...." They do not include "actions which are directed to securing money judgments against the named officers enforceable against their personal assets...."

Thus, unless circumstances indicate otherwise, a government lawyer representing an official named solely in his or her official capacity would still, in effect, be representing the client agency alone, and, unless circumstances indicated otherwise, the government lawyer would deal with the named official as a constituent of the agency rather than as someone personally represented by the government lawyer. Representation of the entity in this context is analogous to the representation of an entity in the private context. See DR 5-109 and ABCNY Opinion 2004-02; see also NY CPLR § 1023, Public body described by official title; NY CPLR Art. 78, Proceeding against body or officer; cf. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97, comment (c) (2000), Identity of a governmental client. Issues regarding constituents represented only "in their official capacity" are discussed further in this opinion in section 7, Dealings with Unrepresented Agency Constituents. To the extent the government lawyer deals directly with the official-capacity party in the lawsuit, a clear statement of the limitations of the lawyer's role in the matter is ordinarily required. See infra § 7.

### 6. Representation of Agency Constituents.

In addition to representing governmental entities, it is common for government litigating attorneys to represent individual government employees in their personal capacity for acts undertaken in their official capacities. For example, at the federal level, 28 C.F.R. § 50.15(a) (2004) providesthat a present or former federal official

> may be provided representation in civil, criminal and Congressional proceedings in which he is sued, subpoenaed, or charged in his individual capacity... when the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment and the Attorney General or his designee determines that providing representation would otherwise be in the interest of the United States.

Section 50.15(a)(3) of 28 C.F.R. makes clear that "Justice Department attorneys who represent an employee under this section also undertake a full and traditional attorney- client relationship with the employee with respect to application of the attorney-client privilege."

*7 At the state level, N.Y. Public Officers Law § 17 provides that upon compliance with certain conditions, "the state shall provide for the defense of the em-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ployee in any civil action or proceeding in any state or federal court arising out
of an alleged act or omission which occurred or is alleged in the complaint to
have occurred while the employee was acting within the scope of his public employ-
ment or duties...." Similar authority is given to the New York City Corporation
Counsel by § 7-109 of the Administrative Code of the City of New York, which
provides:

  The corporation counsel, in his or her discretion may appear, or direct any of
his or her assistants to appear, in any action or proceeding, whether criminal or
civil, which may be brought against any officer, subordinate or employee in the
service of the city, or of any of the counties contained therein, by reason of any
acts done or omitted by such officer, subordinate or employee, while in the per-
formance of his or her duty, whenever such appearance is requested by the head of
the agency in which such officer, subordinate or employee is employed or whenever
the interests of the city require the appearance of the corporation counsel....

  Likewise, N.Y. General Municipal Law § 50-k(2), provides for representation of
New York City employees for "any alleged act or omission which the corporation
counsel finds occurred while the employee was acting within the scope of his pub-
lic employment and in the discharge of his duties and was not in violation of any
rule or regulation...." Such representation is conditioned on the employee's "full
cooperation" in the defense of the action and related actions, and a failure or
refusal to cooperate authorizes the corporation counsel "to withdraw his repres-
entation." Id. § 50-k(4). (The interplay of this provision with DR 2-110, With-
drawal from Employment, is beyond the scope of this opinion, but DR 2-110 must be
consulted in connection with any such withdrawal.)

  Employees represented pursuant to provisions similar to the above are no longer
mere "constituents" of the client agency, they are represented clients in their
own rights. See, e.g., American Bar Association (ABA) Informal Op. 1413 (1978) ("a
Government lawyer assigned to represent a litigant... has an attorney-client rela-
tionship with the litigant, and... the lawyer's status as a Government employee
does not exempt him or her from professional obligations, including those to pre-
serve a client's confidences and secrets, that are imposed upon other lawyers").
Obviously, individual representation raises the possibility of conflicts with the
government litigator's obligation to protect the interests of his or her overarch-
ing jurisdiction. These conflicts must be addressed under statutes and regulations
that may govern individual representations as well as under the conflicts provi-
sions of the disciplinary rules.

  For example, 28 C.F.R. § 50.15 (2004) contains extensive provisions addressing
the possibility of a conflict between the "interest of the United States" and that
of the individual employee; of conflicts between multiple individual employees;
and the retention of private counsel in the event of such conflict. N.Y. Public

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Officers Law § 17(2)(b) also provides for representation of an employee by private counsel "whenever the Attorney General determines based upon his investigation and review of the facts and circumstances of the case that representation by the Attorney General would be inappropriate, or whenever a court of competent jurisdiction, upon appropriate motion or by a special proceeding, determines that a conflict of interest exists and that the employee is entitled to be represented by private counsel...." N.Y. County Law § 501(2) directs "the county attorney [to] represent the interests of the board of supervisors and the county" whenever "the interests of the board of supervisors or the county are inconsistent with the interests of any officer," in which case the officer may retain private counsel. See also N.Y. Public Officers Law § 18. A government lawyer assigned to represent an individual constituent should be alert to these statutes and should advise the individual client about them, as relevant, when discussing conflicts of interest.

*8 Beyond statutory or regulatory provisions, the individual client of a government lawyer is entitled to the protections afforded by the conflict provisions of DR 5-105. The government lawyer evaluating representation of an individual employee must explore potential conflicts at the very outset of the relationship. DR 5-105(A). During this process the government lawyer and the government employee must both have a clear understanding of whether preliminary discussions are privileged and who controls the privilege, the agency or the employee. See NYC Eth Op. 2000-1 (prospective client confidences). If the privilege belongs to the individual, there should be a clear understanding as to whether or not the information gained during the representation may be shared with the agency client. See ABCNY No. 2004-2, Representing Corporations and their Constituents in the Context of Governmental Investigations, nn. 9, 11 & 12 and accompanying text, discussing information sharing agreements and prospective waivers of confidentiality. If information disclosed by the individual will be shared with the agency, and especially if the agency has authority to assert or waive the privilege with respect to such information, the government lawyer must consider whether an essentially unprivileged discussion (from the perspective of the employee) will be sufficiently "full and frank" to provide a reliable basis for a conflict determination.

Having gathered the necessary facts, the Government lawyer must decide whether it is possible to represent the individual consistent with DR 5-105. In most if not all cases, DR 5-105(A) will be implicated, because the lawyer would be representing the differing interests of an individual and the government. Therefore, the lawyer will have to apply the "disinterested lawyer" test of DR 5-105 to determine whether multiple representation is appropriate. See ABCNY No. 2004-2, Representing Corporations and their Constituents in the Context of Governmental Investigations. Under DR 5-105(C), the lawyer may represent multiple parties with differing interests only "if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03                                                                Page 11
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

the advantages and risks involved."

   In some cases, the test will not be met, because a disinterested lawyer would
not believe that a single lawyer can competently represent the individual and the
government. For example, where a government agency and an individual agency con-
stituent are both parties, the availability of different defenses for governmental
entities than for individuals may lead to an insurmountable conflict. See, e.g.,
Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) (conflict for law-
yer representing both officer and municipality in action under 42 U.S.C. § 1983
(2004) to take position beneficial to municipality but detrimental to officer);
**Dunton v. County of Suffolk, 580 F.Supp. 974 (E.D.N.Y. 1983)**, rev'd, 729 F.2d 903
(2d Cir.), opinion amended, 748 F.2d 69 (2d Cir. 1984) (disqualifying conflict to
represent both county and individual police officer in action under 42 U.S.C. §
1983 where county intended to argue that officer's actions were ultra vires). The
government lawyer must consider potential conflicts between represented individual
constituents and the interests of the governmental jurisdiction even if a govern-
ment agency is not a party to the action.

   **\*9** If a non-waivable conflict surfaces in a privileged initial interview of a
government employee, the government lawyer may be disqualified from further rep-
resentation of the agency as well as of the employee. See ABCNY No. 2004-2, Rep-
resenting Corporations and their Constituents in the Context of Governmental In-
vestigations. However, depending on the nature of the conflict and the size of the
government law department, judicial decisions may permit the use of appropriate
screening mechanisms to avoid disqualification of the entire government law de-
partment and the assignment of another government lawyer to represent the agency
itself. Cf. People v. English, 88 N.Y.2d 30 (1996); Matter of Schumer v. Holtzman,
60 N.Y.2d 46, 454 N.E.2d 522, 467 N.Y.S.2d 182, (1983); United States v. Vlahos,
33 F.3d 758, 763 (7th Cir. 1994); ABA Formal Op. 342 (1975).

   Assuming the "disinterested lawyer" test has been satisfied, the government law-
yer must obtain appropriate consent after "full disclosure of the implications of
the simultaneous representation and the advantages and risks involved." DR 5-
105(C). See ABCNY No. 2004-2, Representing Corporations and their Constituents in
the Context of Governmental Investigations. The question of who is authorized to
consent on behalf of the government, state, municipality or agency client must be
addressed. Cf. NYSBA No. 629 (government agencies may in otherwise proper circum-
stances give consent to cure a conflict). Whether the government lawyer or an
agency representative is authorized to consent on behalf of the "government" in a
particular matter will ultimately depend on the scope of the legal authority con-
ferred on the government lawyer and the agency.

   Notwithstanding best efforts at the outset of a representation, counsel must be
prepared to deal with conflicts that arise suddenly in the middle of a representa-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion. If that occurs, the lawyer must consider whether the unanticipated conflict requires terminating the representation or whether, under the "disinterested lawyer" test, the representation can continue with consent after full disclosure. See DR 5-105(B), DR 2-110(B)(2), and (C)(2); cf. NYSBA No. 674 (1995) (discussing conflict that arises in joint representation of corporate and individual clients when individual commits perjury in a deposition).

### 7. Dealings with Unrepresented Agency Constituents.

In the course of representing an agency or agency employee, a government lawyer will spend a great deal of time dealing with agency personnel who are not individually represented by the government lawyer and who have not retained personal counsel. These will include constituents whose acts or omissions are the subject of the litigation but who are not parties to the action; constituents who are fact witnesses; and constituents otherwise designated to speak for the agency in discovery or trial. Dealings will occur most commonly in the context of investigatory interviews; deposition preparation and depositions; and trial preparation and trial. These are dealings where the agency constituent (and government lawyer) may not be entirely without confusion as to the role of the government lawyer.

**\*10** DR 5-109(A) provides the following initial guidance to the lawyer in such circumstances:

When a lawyer employed or retained by an organization is dealing with the organization's directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.

DR 7-104(A)(2) further instructs that a lawyer may not "[g]ive advice to a party who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such party are or have a reasonable possibility of being in conflict with the interests of the lawyer's client." In order to avoid confusion, as well as to avoid a finding that the government lawyer inadvertently entered into a lawyer-client relationship with the constituent, see, e.g., RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14(1)(b) (2000) and comment f thereto, [FN5] the government lawyer must analyze in advance exactly what his or her role will be in dealing with the constituent in the proceeding at issue, and then provide such affirmative explanation of that role as may be necessary to the situation. [FN6]

For example, in the context of investigatory interviews, the government lawyer might explain that he or she is the attorney for the agency, or a component thereof; and might also explain from whom within the organization-for example, the agency head, component head, or other official-he or she takes substantive direc-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

tion in the matter. The government lawyer might then explain that he or she has been assigned to find out the facts relating to a particular matter; and, as may be appropriate, explain to the constituent the nature of any privilege and who holds the privilege.

Understanding and explaining the government lawyer's role in the context of formal adversarial proceedings, as in preparing for or appearing with a constituent at a deposition or trial, is more complex. In this regard, the government lawyer may, for example, explain the nature of the action; the status of the agency or component as a party or potential party; and that he or she represents the agency or component in the matter. The government lawyer might also explain to whom within the organization, such as the agency head or other delegated official, he or she reports on the matter and who is responsible for setting the agency's position in the litigation. Then, depending on the circumstances, the government lawyer might explain that the employee is being prepared and called to testify in a matter relating to the employee's conduct as a constituent; and that it is in the agency's interest that the employee is fully prepared for the deposition. It may also be appropriate, depending on the circumstances, for the government lawyer to reassure the employee that the agency sees nothing wrong with how the agency or the particular constituent handled the matter at issue and will vigorously defend the case. The DR 5-109(A) warning may be given as required, or earlier as counsel may prefer. Depending on the nature of the proceedings and how the lawyer expects them to be conducted, the lawyer may further explain that as agency counsel he or she will make objections; advise the constituent on issues of agency privilege; and deal in other ways with counsel at proceedings involving the examination of an agency constituent.

*11 Additional obligations may arise later and unexpectedly. For example, the agency constituent may disclose negative information regarding the facts at issue, or regarding personal conduct relevant to credibility that may be embarrassing-or worse-for the constituent. Sometimes, although the government lawyer does not represent the constituent personally, it may be in the interests of the agency for the government lawyer to object to a line of inquiry or take other action in order to prevent unwarranted intrusion into the privacy of its constituent. In many instances, however, particularly given the heightened obligations of candor incumbent on a government lawyer, the government lawyer may intend to disclose embarrassing information received from the constituent. It may be necessary to explain to the constituent that the agency intends to make such disclosure, and that the constituent would have to obtain personal counsel to press any objection. See, e.g., United States v. Schaffer Equip. Co., 11 F.3d. 450, 457 (4th Cir. 1993) (government lawyers breached "general duty of candor to the court [that] exists in connection with an attorney's role as an officer of the court" by failing to reveal government expert's falsification of credentials). See also RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97 comment f. In this regard, we believe

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03                                        Page 14
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

that it is always appropriate for government counsel to advise that under no circumstances may the constituent testify falsely. Cf. NYSBA No. 728 (2000) (DR 7-104(A)(2) "has been understood to allow a lawyer, additionally, to give certain non- controvertible information about the law to enable the other party to understand the need for independent counsel").

NYSBA No. 728, which dealt with a government attorney's role as "investigator of the facts relevant to his client's cause," addressed another issue government lawyers occasionally confront in dealing with witnesses and agency constituents: whether there is an ethical obligation to advise the constituent of the risk of self-incrimination. The opinion addressed that question in the context of a municipal attorney interviewing an unrepresented claimant against the municipality whose claim related to a matter that had also led to criminal proceedings against the claimant. The opinion noted that an advice of rights might both serve (by promoting fair dealing) and disserve (by impeding information gathering) the municipality's interests. Thus, "[t]he municipal attorney might reasonably conclude that the municipality's interest in dealing fairly with the public justifies advising the unrepresented claimant to secure a lawyer, even in circumstances where a private party's lawyer would be disinclined to give this advice." Id. However, "there is nothing in the disciplinary rules that explicitly requires the municipality's attorney to advise the unrepresented claimant about the need for a lawyer or the risk of self-incrimination," and the opinion thus left it to the municipality's law department (or as may have been delegated to individual attorneys) to decide, "as a matter of sound public policy and professional judgment," whether or not to give advice about the need for an attorney and the risk of self-incrimination. Id. Cf. United States v. Valdez, 16 F.3d 1324 (2d Cir.) (discussing trial court's discretion to advise unrepresented witness of his right against self-incrimination), cert. denied, 513 U.S. 810 (1994); People v. Siegel, 87 N.Y.2d 536, 663 N.E.2d 872, 640 N.Y.S.2d 831 (1995) (similar).

                    8. Wrongdoing by an Agency Constituent.
*12 When confronted with wrongdoing by an agency constituent, DR 5-109(B) provides the following guidance:

   If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the respons-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

ibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include, among others:

  1. Asking reconsideration of the matter;

  2. Advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

  3. Referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

  DR 5-109 provides useful direction to the government lawyer. We note that reporting organizational wrongdoing may again require the government lawyer to confront the question of what organization he or she represents in a given matter in order to determine "the highest authority that can act in behalf of the organization as determined by applicable law." See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97, comment (c), Identity of a governmental client (regarding the different forms and divisions in which government agencies may exist); comment j, Wrongdoing by a constituent of a governmental client ("referral can often be made to allied governmental agencies, such as... a state's office of attorney general"); ABA Model Rules of Professional Conduct, Rule 1.13 Comment, Government Agency ("in a matter involving the conduct of government officials, a government lawyer may have authority [under applicable law] to question such conduct more extensively than that of a lawyer for a private organization under similar circumstances"). A related question is what entity may have authority to authorize disclosure of information that may be otherwise privileged. See RESTATEMENT § 74, comment e, Invoking and waiving the privilege of a governmental client (noting that in some states, the attorney general has authority to waive the privilege, and in other states, the decision is made by another executive officer or agency). In addition, many government agencies are subject to statutes and regulations governing the reporting of waste, fraud and abuse. [FN7] The nature of any privilege and who controls it must be clearly understood by the government attorney. These are issues of law which the government attorney must resolve as may be necessary to comply with DR 5-109(B)(3).

  **\*13** Finally, DR 5-109(C) provides that "[i]f, despite the lawyer's efforts in accordance with DR 5-109(B), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in a substantial injury to the organization, the lawyer may resign in accordance with DR 2-110." DR 5-109(C) provides its small comfort equally to the government lawyer as to private counsel for an organization. But as discussed above, government counsel will have many alternatives to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

consider before concluding that withdrawal is the only recourse. [FN8]

### Conclusion

Government lawyers are subject to the rules that ordinarily govern the attorney-client relationship, including those governing conflicts of interest and entity representation. However, the conflict of interest questions encountered by government lawyers in civil representation may be particularly complex, and the questions may ultimately be analyzed differently for government lawyers, because of the legal framework within which they function. For example, threshold questions about the identity of the public client, and about whether particular decisions in the representation are entrusted to the government lawyer or to an agency representative, must be determined by reference to the law establishing the government law department, and not exclusively by referring to disciplinary provisions. Similarly, the question of whether a government law department may represent multiple government agencies with differing interests, or even antagonistic positions, is in part a question of law, although ethical considerations suggest that, at the very least, it is advisable to avoid representing public agencies in disputes with each other.

In dealing with individuals within the government (e.g., officers or employees of a government agency), government lawyers must comply with DR 5-109, which generally governs the representation of an entity. When the agency constituents are unrepresented and the government lawyer does not propose to represent them, the lawyer must clarify his or her role as set forth in this opinion. In that event, the government lawyer will be limited in the extent to which he or she may provide advice to the individual. When the lawyer learns of wrongdoing by an unrepresented constituent of the agency, the lawyer must take steps to prevent or rectify the wrongdoing as required by DR 5- 109(C) as well as in accordance with legal obligations.

When the government lawyer proposes to represent the constituent, a threshold question is whether the constituent will be represented in his or her official or personal capacity. If the constituent would be represented personally, the lawyer must first determine whether the representation is permissible under the conflict of interest rule, DR 5-105, and must comply with the rule's procedural requirements in light of the framework provided in this opinion.

FN1. EC 7-14 provides as follows:
   A government lawyer who has discretionary power relative to litigation should refrain from instituting or continuing litigation that is obviously unfair. A government lawyer not having such discretionary power who believes there is lack of merit in a controversy submitted to the lawyer should so advise his or her superiors and recommend the avoidance of unfair litigation. A government

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and should not use his or her position or the economic power of the government to harass parties or to bring about unjust settlements or results. The responsibilities of government lawyers with respect to the compulsion of testimony and other information are generally the same as those of public prosecutors.

FN2. We also note the existence of 28 U.S.C. § 530B and 28 C.F.R. Part 77, which specifically subject attorneys of the Department of Justice to the rules of professional responsibility of the states in which they practice law.

FN3. There may be exceptions where, for example, the government law office has a conflict of interest. See, e.g., Williams v. Rensselaer County Bd. of Elections, 118 A.D.2d 966, 500 N.Y.S.2d 190 (3d Dep't 1986) (Commissioner of county's Board of Elections was entitled to independent counsel in litigation in which his interests conflicted with those of the county); Judson v. City of Niagara Falls, 140 A.D. 62, 129 N.Y.S. 282 (4th Dep't 1910) (city council may employ independent counsel to conduct investigation of city departments where, otherwise, corporation counsel would appear as legal advisor of two antagonistic departments and the committee investigating them), aff'd, 204 N.Y. 630, 97 N.E. 1107 (1912).

FN4. See, e.g., The Attorney General's Role as Chief Litigator for the United States, 6 U.S. Op. Off. Legal Counsel 47, 1982 WL 170670 (O.L.C.), discussing the Attorney General's "full plenary authority over all litigation" and his role in "coordinat[ing] the legal involvements of each .client' agency with those of other .client' agencies, as well as with the broader legal interests of the United States overall." The opinion also emphasizes "that in exercising supervisory authority over the conduct of agency litigation, the Attorney General will generally defer to the policy judgments of the client agency," and that "policy concerns... implicated in decisions dealing with litigation strategy... will [be] accomodate[d]... to the greatest extent possible without compromising the law, or broader national policy considerations." The New York State Attorney General is reported to have a similar view of his authority. See J.Weinstein, Some Reflections on Conflicts between Government Attorneys and Clients, 1 Touro L. Rev. 1 (Spring, 1985), n. 17, available on Westlaw as C317 ALI-ABA 959, citing Attorney General's Memorandum, Powers of the Attorney General in the Conduct and Control of Litigation for State Agencies. See also Feeney v. Commonwealth, 366 N.E.2d 1262 (Sup. Ct. Mass. 1977) (Massachusetts' Attorney General may decide to appeal over the objections of state officers whom he represents); Sec'y of Admin. and Fin. v. Attorney Gen., 326 N.E.2d 334 (Sup. Ct. Mass. 1975) (Attorney General may refuse to appeal over the objection of the State Secretary of Administration and Finance).

FN5. A personal representation would require, among other things, a conflict analysis, informed consent, and compliance with agency procedures. ABCNY No. 2004-2,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYC Eth. Op. 2004-03
NYC Eth. Op. 2004-03, 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.)
(Cite as: 2004 WL 3241602 (N.Y.C.Assn.B.Comm.Prof.Jud.Eth.))

Page 18

Representing Corporations and their Constituents in the Context of Governmental Investigations, contains a pertinent discussion of the factors to be considered in evaluating conflicts and structuring such a representation to minimize potential conflict. Compare U.S. Dep't of Justice, Office of Legal Counsel, Memorandum, Relationship between Department of Justice Attorneys and Persons on whose Behalf the United States Brings Suits Under the Fair Housing Act (Memorandum dated January 20, 1995), http:// www.usdoj.gov/olc/1995opinions.htm (concluding that when the Department of Justice undertakes a civil action on behalf of a complainant alleging a discriminatory housing practice under the Fair Housing Act, it does not establish an attorney-client relationship with the complainant, and discussing potential applicability of common interest/joint defense privilege).

FN6. There may be situations where the government perceives that its paramount legal obligation is to obtain information from the individual and that it is not free to provide the necessary clarification. An analysis of such situations is beyond the scope of this opinion. There may also be situations where the lawyer for the government becomes the lawyer for these constituents as well. A specific analysis of such situations is also beyond the scope of this opinion.

FN7. For example, relying principally on 28 U.S.C. § 535 (2002), the Professional Ethics Committee of the Federal Bar Association has stated that it "does not believe there are any circumstances in which corrupt conduct may not be disclosed by the federally employed lawyer," apart from circumstances involving personal representation of an individual by the government lawyer. Op. 73-1, The Government Client and Confidentiality, 32 Fed. Bar. J. 71 (1973). This is a question of law as to which we do not opine.

FN8. There may also be situations where it is permissible or necessary for the government lawyer to withdraw written or oral opinions or representations that the lawyer previously gave. See 4-101(C)(5). An analysis of such situations is beyond the scope of this opinion.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT 4**

| 935413 NUNEZ | 11/26/04 | 11/26/04 | 07/12/04 | As a candidate, PPO withheld a history of significant fear of elevators, subways and possibly other closed-in spaces. This came to light following incidents during recruit training at John Jay College. Prognosis: Probable separation. Gathering info on incident at John Jay College, some received more pending. |
|---|---|---|---|---|



PLAINTIFF'S
EXHIBIT
9
Blumberg No. 6113

PREVIOUSLY MARKED
#13

```
 1                        Archibald
 2    the time they enter the system, pretty much,
 3    to the time they're appointed.
 4         Q.      That's for the investigators to
 5    see if a person's qualified, at least that
 6    piece?
 7         A.      Yes.
 8         Q.      To see, when they're canvassing a
 9    list of persons, to see if they're eligible
10    to go into the police department; right?
11         A.      Yes.
12         Q.      At that point she was eligible;
13    right?
14         A.      Yes.
15              MR. SANDERS:  Mark this as
16         No. 13.  It's Bates stamped PS0133.  It
17         looks like some kind of note with other
18         people's names on it, but it's got on the
19         bottom Nunez and her tax number and the
20         date she was restricted, which is
21         11/26/2004, and it's a status and
22         prognosis.  I don't know what form that
23         belongs to.
24              (Whereupon, Plaintiff's
25         Exhibit 13, Status prognosis, was marked
```

1          Archibald

2          for identification.)

3          Q.     Do you know what form that is?

4          A.     I don't think this is a form.

5     This looks like one page of a report that's

6     generated on probationary police officers in

7     preparation for a meeting that is held

8     periodically at headquarters to discuss --

9          Q.     What report is that?

10         A.     It's a report that's put together

11    specifically on probationary police officers

12    who are on restrictive duty.

13         Q.     To the chief of personnel, Chief

14    Rafael Panero?

15         A.     The meetings are in Chief

16    Panero's office.  I don't know if he gets a

17    copy of this or if it's just used by the

18    person who's presenting the status.

19         Q.     Do you know who prepared that

20    box?

21         A.     I believe it was

22    Dr. Creagh-Kaiser who wrote the little

23    description, but she would not have actually

24    prepared this form.

25         Q.     What does that box say, if you

1                          Archibald

2      can read it?

3           A.      "As a candidate, PPO withheld a

4      history of significant fear of elevators,

5      subways and possibly other closed-in spaces.

6      This came to light during training at John

7      Jay.  Prognosis:  Probably separation.

8      Gathering information at John Jay College,

9      some received, more pending."

10          Q.      What is this significant history

11     of fear of elevators and subway, what does

12     that mean?

13          A.      It refers to the information that

14     we received at Psychological Services, that

15     she was afraid to get into the elevator at

16     John Jay and had made the statement to a

17     couple of different people that she was

18     claustrophobic.

19          Q.      Did you read that note?

20          A.      Did I previous to this?

21          Q.      Yes.

22          A.      I don't know whether it was me or

23     Dr. Creagh-Kaiser.

24          Q.      If you didn't prepare that note,

25     how could you testify as to what that

1                          Archibald

2    significant history meant?  Whoever prepared

3    that report, how could you testify to that?

4    You're assuming that's what that means?

5         A.    Yes, that's true.

6         Q.    Because a significant history, as

7    I sit here today, are three statements from

8    individuals, right, Police Officer Akeno,

9    Sergeant Patel and Magdalena Vincente from

10   the security guards; right?

11        A.    Right.

12        Q.    That's a one-day event,

13   11/19/2004; right?

14        A.    But their statements refer to

15   other things.

16        Q.    Dr. Archibald, she had a one-time

17   contact on 11/19/2004, isn't that what the

18   facts are in this case?

19        A.    No, the facts are that in

20   reporting what had happened on that date,

21   they quote Miss Rodriguez as saying that she

22   was claustrophobic.

23        Q.    There's one event that occurred

24   here, and that was on 11/19/2004.  That's the

25   only thing in the history of her

1 Archibald

2 psychological profile, about anything about

3 any disorder; isn't that true?

4     A.     No, I wouldn't say that.

5     Q.     Those three statements from those

6 individuals, what date did that occur?

7     A.     It was November of --

8     Q.     19, 2004; right?

9     A.     2004.

10     Q.     Are there any statements about

11 any claustrophobia prior to this?

12     A.     No.

13     Q.     Is there any history of

14 claustrophobia prior to this?

15     A.     The statements, yes.

16     Q.     The statements were generated

17 after 11/19, by the way.  It wasn't done the

18 same day.

19          These are the only statements in

20 her record that even suggest anything about

21 claustrophobia?

22     A.     The statements of these three

23 people suggest the claustrophobia, yes.

24     Q.     On 11/19/2004?

25     A.     Right.  Yes.