Koschitzki v. Apple Inc. et al

Doc. 261 Att. 1

# EXHIBIT 9

Dockets.Justia.com

FRE 801(d)(2)    901(7)
803(1)    902(1)
803(3)    902(2)
803(5)



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

May 13, 2005

Mr. Joseph DeMarco
Deputy Commissioner
Department of Citywide Administrative Services
Municipal Building, 21ˢᵗ Floor
New York, New York 10007

PLAINTIFF
EXHIBIT
#38

Dear Mr. DeMarco:

It is requested that Probationary Police Officer Christopher Santora, Social Security # ▮▮▮▮▮▮, appointed on July 1, 2004, be **decertified** based upon an investigation conducted by this Department's Medical Division, in conjunction with the Applicant Processing Division. The investigation into this matter revealed that Probationary Police Officer Santora falsified/omitted several important and critical facts during his initial psychological candidate evaluation. If these facts were known at the time of appointment, Probationary Police Officer Santora would not have been hired. Therefore, Probationary Police Officer Santora is unable to fulfill the requirements necessary to be a New York City Police Officer and must be decertified.

This Department's Psychological Evaluation Unit originally interviewed Probationary Police Officer Santora on June 16, 2004. During this interview, Probationary Police Officer Santora reported only having received▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After a request for his high school records yielded negative results, Probationary Police Officer Santora was deemed qualified by the Psychological Evaluation Unit and appointed to the New York City Police Department on July 1, 2004.

As Probationary Police Officer Santora's applicant case investigation progressed, the Psychological Services Section conducted a routine request for New York State Mental Health records. The inquiry revealed that Probationary Police Officer Santora had, in fact, been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Probationary Police Officer Santora was given a follow up interview on October 25, 2004, and he was confronted with the results of t▮▮▮▮▮▮▮▮▮▮y. Probationary Police Officer Santora continued to be less than forthright regarding his ▮▮▮▮ ▮▮▮. He stated that he attended ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Probationary Police Officer Santora's medical records, however, revealed the following:

• ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

sp 0005



It is recommended that Probationary Police Officer Santora be decertified. The Psychological Evaluation Unit has acquired all accessible psychological information and medical records to substantiate the omissions made by Probationary Police Officer Santora. He has omitted falsified relevant information concerning his psychological and emotional makeup. He deliberately failed to disclose information that would have had a direct impact on his hiring. This Department's Psychological Evaluation Unit believes these omissions of pertinent information would have disqualified Probationary Police Officer Santora, if known prior. In their professional opinion, they believe ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ with stressful situations. The New York City Police Department is no place for Probationary Police Officer Santora and based on his fraudulent behavior, it is requested that he be expeditiously decertified.

Sincerely,

Raymond W. Kelly
Police Commissioner

IDC 138-2005-0051

## FIRST ENDORSEMENT

First Deputy Commissioner to Police Commissioner, May 3, 2005   Contents noted
Recommend Approval of the request to **decertify** Probationary Police Officer Christopher
Santora, Tax #934334, assigned to the Police Academy Recruit Training Section   Forwarded for
your consideration

George A. Grasso
**First Deputy Commissioner**

**APPROVED**

MAY 09 2005

RAYMOND W. KELLY
POLICE COMMISSIONER

GAG KPL jwj

## SECOND ENDORSEMENT

Commanding Officer Police Commissioner's Office to First Deputy Commissioner, attn: Chief
of Personnel, May 9, 2005. Please note the Police Commissioner's **APPROVAL** of the First
Endorsement and the recommendation to decertify Probationary Police Officer Christopher
Santora, Tax # 934334. Forwarded for necessary attention.

Lowell Stahl
Assistant Chief

LS/attachment
cc:  File (1)

**sp 0007**

PB# 0313–1C

IDC 138-2005-0051

## THIRD ENDORSEMENT

First Deputy Commissioner to Chief of Personnel, May 10, 2005   Contents noted   Please note the Police Commissioner's Approval of the request to **decertify** Probationary Police Officer Christopher Santora, Tax #934334, assigned to the Police Academy Recruit Training Section. Forwarded for your necessary attention.

George A. Grasso
**First Deputy Commissioner**

GAG/KPL/jwj



sp 0008

IDC 133-05-005 7
EMD # 1042 05

PB # 0313-1C

## POLICE DEPARTMENT
## CITY OF NEW YORK

May 3, 2005

From:        Chief of Personnel

To:          First Deputy Commissioner

Subject:     **RECOMMENDATION TO DECERTIFY PROBATIONARY POLICE OFFICER CHRISTOPHER SANTORA, TAX # 934334, ASSIGNED TO THE POLICE ACADEMY RECRUIT TRAINING SECTION**

1.        It is recommended that Probationary Police Officer Christopher Santora, tax # 934334, appointed on July 1, 2004, be decertified.  The Psychological Evaluation Unit, in conjunction with the Applicant Processing Division, recently uncovered information that, if known prior to Probationary Police Officer Santora's appointment, would have resulted in his disqualification.

2.        Probationary Police Officer Santora was first interviewed by the Psychological Evaluation Unit on June 16, 2004 regarding his candidacy for the New York City Police Department, exam # 1049, list # 5417.  During this interview Probationary Police Officer Santora stated that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  The ▓▓▓▓▓▓▓ Psychological Services Section requested documentation from Pine Bush Central High School regarding the information provided by Probationary Police Officer Santora, yielding negative results.  Based on the available information, Probationary Police Officer Santora was appointed to the New York City Police Department on July 1, 2004.

3.        As Probationary Police Officer Santora's applicant case investigation progressed, the Psychological Services Section conducted a routine request for New York State Mental Health records.  The inquiry revealed that Probationary Police Officer Santora ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  During a follow up interview conducted on October 25, 2004, Probationary Police Officer Santora consented to having his medical history released to the Psychological Services Section.  Probationary Police Officer Santora then stated that ▓▓▓▓▓▓.  Probationary Police Officer Santora ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Probationary Police Officer Santora's Applicant Candidate interview sheet (APD # 8) also reflected his omission of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  It should be noted that Probationary Police Officer Santora was disqualified as a Probationary Police Officer candidate on exam # 1039.

sp 0009

list # 2877 based on his responses to 

4.     A review of his medical records indicated that on May 2, 1997,

5.     Probationary Police Officer Santora reported to the Psychological Services Section for a third interview on February 8, 2005. This interview was to discuss his failure to disclose



Probationary Police Officer Santora then

6.     It is recommended that Probationary Police Officer Santora be decertified. Probationary Police Officer Santora made false statements and omitted key information during his candidate applicant processing. As a result, he has acquired a position for which he is not suited. In the past, he has had

Though he has not demonstrated                                    , his propensity for                              makes him susceptible to regression. It is in his best interest and the best interest of this Department, that he be expeditiously decertified. Attached is a communication for the Police Commissioner's signature requesting Deputy Commissioner Joseph DeMarco to commence decertification proceedings.

7.     For your consideration.

RP·md/md

Rafael Pineiro
Chief of Personnel

PB#0313C

MD #73

## 1ST ENDORSEMENT

Commanding Officer, Medical Division to Chief of Personnel, April 14, 2005. Contents Noted. Attached are the recommendations from the Psychological Services Section for Probationary Police Officer Christopher Santora, Tax #934334, Police Academy Training Unit. For your information.

KH/jb
attachment

Kevin Holloran
Deputy Inspector

POLICE DEPARTMENT
CITY OF NEW YORK

7/14/05

From:      Chief of Personnel

To:        Police Commissioner

Subject:   RESIGNATION OF UNIFORMED MEMBER OF THE SERVICE

  1.    P.O. Chris Santora             Command: PARTS
        SS#: ████████████              Tax#:    934334
has submitted a resignation effective
        6/2/05 0930 hrs

  2.    Reason: Personal

  3.    CPI: Resigned in lieu of decertification
              by the Department of Citywide
              Administrative Services

  4.    Recommend resignation with the permission of the
Police Commissioner be Disapproved.


                        Rafael Pineiro
                        CHIEF OF PERSONNEL


resgform.doc/gj

**EXHIBIT 10**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| X | EEOC | |

**New York State Division of Human Rights** and EEOC

*State or local Agency, if any*

| NAME (*Indicate Mr., Ms., Mrs.*) | HOME TELEPHONE (*Include Area Code*) |
|---|---|
| Mrs. Rachel Rodriguez | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one list below.*)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (*Include Area Code*) |
|---|---|---|
| Police Department City Of New York | 500 + | ▓▓▓▓▓ |

| STREET ADDRESS CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| One Police Plaza, Room 1204 New York, N.Y. 10038 | New York |

| NAME | TELEPHONE NUMBER (*Include Area Code*) |
|---|---|
| | |

| STREET ADDRESS CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(e's)*)

| [X] RACE | [X] COLOR | [X] SEX | [ ] RELIGION | [ ] AGE |
|---|---|---|---|---|
| [X] RETALIATION | [X] NATIONAL ORIGIN | [ ] DISABILIT | [X] OTHER | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)

[X] CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

I hereby charge the following individuals with numerous violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 3; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(3), 1986; New York Executive Law § 296; New York City Administrative Code §§ 8-107 and 8-502; New York City Administrative Code § 14-115; Intentional Infliction of Emotional Distress and the Intentional Interference with a Contract:

Police Commissioner Raymond W. Kelly
Deputy Commissioner S. Andrew Schaffer, Legal Matters
Deputy Commissioner Neldra M. Zeigler, Office of Equal Employment Opportunity
Deputy Commissioner James J. Fyfe, Phd., Training
Chief Rafael Pineiro, Chief of the Personnel Bureau
Dr. Eli J. Kleinman, Supervising Chief Surgeon
Deputy Chief Diana L. Pizzuti, Commanding Officer of the Police Academy
Deputy Inspector Kevin Holloran, Commanding Officer of the Medical Division
Arnold S. Wechsler, Director of the Employment Management Division
Dr. Eloise Archibald, Director of the Psychological Services Section
Deputy Inspector Scott T. Loos, Commanding Officer of the Recruit Training School
Lieutenant Carabetta, Recruit Training School
Lieutenant Zweibel, Recruit Training School

PLAINTIFF'S EXHIBIT
28

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *Rachel Rodriguez* | *Rachel Rodriguez* |
| Date 5.17.05    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

Eric Sanders
Atty and Counselor at Law
State of New York
No. 02SA6118522
Qualified in Suffolk County

Sergeant Saledine Patel, Recruit Training School

On or about November 19, 2004, my company was assigned to attend an Emotionally Disturbed Person Workshop at John Jay College of Criminal Justice 555 West 57th Street New York, N.Y. At or about 2:00 P.M., I was approached by Sergeant Saledine Patel, who accused me of having a panic attack because of an alleged fear of being in confined locations especially elevators. To this date, I still cannot quite understand where she came up with this idea. At no time did I then nor do I now, have a fear of confined locations or elevators. Prior to my employment with the Department, I lived on the nineteenth floor of a high rise building and I worked as a flight attendant for a major commercial charter airlines where I consistently flew at or about 41,000 feet on transatlantic flights. Upon information and belief, I was being treated differently then other similarly situated non-minority members of the academy.

On or about November 26, 2004, while assigned to Floyd Bennett Field, Brooklyn, N.Y., I was ordered by Recruit Operations to report forthwith to Lefrak to see Dr. Eloise Archibald, the Director of Psychological Services Section. Upon my arrival she stated "why did you lie to me." However, before I could answer she said "I am tired of this." She further stated "You seem like a nice person, do yourself a favor and don't ask me any questions." The interview ended some time later. Dr. Archibald has a history of discriminating against minority candidates seeking permanent appointment to the title of Police Officer.

On or about November 30, 2004, I was assigned to Rodman's Neck to perform tactical exercises in the Tactical House. Note: The Tactical House is close quarters and we were driven to the location inside the back of an enclosed Department Prisoner Van. At no time did I have a panic attack. Nor were any academy personnel concerned about me having any such attack.

On or about December 27, 2004, it was Gun and Shield Day and I was dressed in full regular duty police uniform when I was approached by Sergeant Harrison (Recruit Operations) who pulled me out of the class and asked me "How come you have not been signing in and out of Recruit operations?" I replied "I do not have a reason to do so." Sergeant Harrison replied "Yes you do, you are on restricted duty." Later that day, I was ordered to go to the Counseling Unit where I called Dr. Eloise Archibald, She informed me that she needed my OB/GYN records and that it was the last piece of information that she needs to complete her investigation. She also promised me that she will render a decision by graduation but, could not promise that it would be in my favor. To this day, I have no idea what she was talking about. No one ever informed me that my duty status was changed. Based on my Restricted Duty status, I could not receive my gun and shield as my classmates. Upon information and belief, other non-minority members of the academy were treated differently.

On or about December 28, 2004, I was informed by Recruit Operations that I will not be graduating with my class.

On or about December 29, 2004, I spoke with Sergeant Rosado of the Counseling Unit and she said "She did not know much about my case." I was referred to Patrolman's Benevolent Association Delegate Police Officer Steven Wallace and he informed me that I might be getting terminated. At no time, did Sergeant Rosado or Officer Wallace inform me as to what was going on.

On or about January 3, 2005, I was assigned to the library to do nothing.

On or about January 10, 2005, at or about 12:00 P.M., I was ordered to measure the entire fifth floor of the academy along with another recruit Police Officer Christ Santora. At or about 1:00 P.M., I was ordered to clean two rooms on the fifth floor by Lieutenant Carabetta. Upon information and belief, other non-minority members of the academy were treated differently.

On or about January 12, 2005, I was ordered to clean the entire gymnasium along with the other holdover recruits. Upon information and belief, there was nothing in the duties and responsibilities of the civil service title of Police Officer or the collective bargaining agreement with the City of New York that authorized the management to order me to perform custodial work. Also, upon information and belief, non-minority members of the academy were not ordered to perform such work.

On or about January 13, 2005, I was ordered to measure the first floor, fifth floor, video unit and the sub-basement.

On or about January 14, 18, 19, 25, 2005, I continued to measure the academy.

On or about January 28, 2005, Lieutenant Zweibel ordered me to put all of the measurements into an Excel spreadsheet.

On or about February 3, 2005, I was ordered to count each of the restrooms throughout the entire academy including the urinals, toilets and shower heads.

On or about February 8, 2005, Lieutenant Zweibel ordered me to re-draw all of the floor plans for

the entire academy.

On or about February 9, 10, 11, 14, 15, 18, 2005, I was ordered to continue measuring, drawing an entering data into the Excel spreadsheet as well as picking up Lieutenant Zweibel's lunch fro Blooming Farm House Deli 2nd Avenue and East 20th Street, New York, N.Y.

On or about March 28, 2005, I complained about the aforementioned conduct to Deputy Commissioner S. Andrew Schaffer, Legal Matters; Deputy Commissioner Neldra M. Zeigler, Office of Equal Employment Opportunity; Deputy Commissioner James J. Fyfe, Phd., Training; Chief Rafael Pineiro, Chief of the Personnel Bureau; Dr. Eli J. Kleinman, Supervising Chief Surgeon Deputy Chief Diana L. Pizzuti, Commanding Officer of the Police Academy; Deputy Inspector Kevin Holloran, Commanding Officer of the Medical Division and Dr. Eloise Archibald, Director of the Psychological Services Section.  The complaint was assigned Log No.: 073s05.

On or about April 15, 2005, in retaliation about reporting such conduct I was terminated.  Upor information and belief, I was subjected to such conduct due to my race, color, sex and nationa origin.



POLICE DEPARTMENT
Legal Bureau
One Police Plaza, Room 1406
New York, NY 10038
(646) 610-5400



FRE 801(d)(2)

July 27, 2005

Peter Alan Holland
Senior Investigator
U.S. Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

                              RE:    Rachel Rodriguez v. NYPD
                                     Charge No. 160-2005-02584

Dear Mr. Holland:

      This position statement is submitted on behalf of the New York City Police Department
("The Department" or "Respondent") in response to the above-captioned charge of
discrimination filed by former Probationary Police Officer Rachel Rodriguez ("Complainant"),
which is dated June 7, 2005. The Complainant alleges that the Department unlawfully
discriminated against her because of her race/color, national origin and sex and retaliated against
her in violation of the Title VII of the Civil Rights Act.

      It should be noted at the outset that Complainant's allegations of violations of 42 USC §§
1981, 1983, 1985(3), 1986, and Intentional Infliction of Emotional Distress and the Intentional
Interference with a Contract cannot be asserted here, as the Equal Employment Opportunity
Commission does not have jurisdiction over these matters. Complainant's inclusion of these
claims is unwarranted, frivolous, and without evidentiary support.

      Regardless, the Department denies each and every allegation of discriminatory and
retaliatory employment practices contained in the charge. Complainant fails to present a prima
facie case of discrimination, and any action involved was for a legitimate, nondiscriminatory
purpose and in accordance with the relevant statutory and Department regulations. Finally,
Complainant submits no evidence that her participation in a protected activity caused her
termination, and cannot sustain a charge of retaliation. Therefore, the Department respectfully
requests that the complaint of discrimination and retaliation be dismissed in its entirety.

                                        –1–



PLAINTIFF'S
EXHIBIT
29

D1

## FACTS

The NYPD appointed the Complainant to the position of Probationary Police Officer on July 1, 2004. Prior to being appointed, the Complainant completed the NYPD's hiring process. This process included a written and oral psychological evaluation. Although the Complainant was originally deemed fit for duty by the NYPD's Psychological Services Section, she displayed behavior during her training at the Police Academy that caused her to be re-evaluated by the Psychological Services Section. She was terminated because the NYPD found that she would not be able to perform the duties of a police officer due to psychological unsuitability. Complainant now alleges that during her re-evaluation, she was discriminated against because of her race, color, national origin, and sex. She further alleges that her termination was a retaliatory act by the Department.

Complainant passed the written civil service exam for police officer in February of 2002. Every applicant must successfully complete a written and oral psychological examination prior to being hired as a police officer. These psychological examinations evaluate the applicant's ability to work under the pressures and extreme situations of being a police officer. On March 8, 2004, a staff psychologist examined the Complainant. On that date, Complainant denied any special fears, such as claustrophobia, fear of travel, crowds, water, heights and/or animals. The staff psychologist found the Complainant psychologically suitable to perform police work based on her written examination and the answers that she provided during the oral examination.

On November 19, 2004, Complainant attended an "Emotionally Disturbed Persons Workshop" at John Jay College with her company,[1] which was comprised of both minority and non-minority men and women. The classroom was located on the 6th floor of the building. Complainant asked the building's security guards to use the stairs. However, because of security reasons, none of the staircases provided entrance to the 6th floor. Therefore, the security guards denied her access to the stairs. She waited in the lobby while her company utilized the available elevators. At that time, the Complainant displayed symptoms of severe anxiety over entering an elevator. Complainant told a security guard that she was afraid to take the elevator because of its small size. As a result, security escorted her on a larger freight elevator to the 6th floor. While in the elevator, she tested the doors ability to open quickly by waving her arm through the closing doors. She also required a full explanation of the elevator system before she allowed the doors to close. When she exited the elevator, Complainant let out a sigh of relief. She told the security guard that she was claustrophobic and did not like small spaces.

During the workshop, Complainant was randomly selected by the instructor to conduct a scenario of a woman having a panic attack on the subway. Although the Complainant handled the beginning of the scenario well, she became defensive and agitated when the other officers would not remove the woman to another "subway car." The space in the simulated subway car was limited because of the number of officers that were present. When asked why she wanted to move the woman, the Complainant told the instructor that she understood how the woman felt because she was claustrophobic, too. After the scenario, the instructor asked the Complainant whether she thought that being a police officer suffering from claustrophobia was a danger to

---

[1] A "company" is a subunit of the Police Academy graduating class. It is comprised of approximately 25-40 recruits.

herself and to others. Complainant replied that she would be able to control it during a stressful situation.

Complainant did not go to lunch with the other recruits and instead remained in the classroom. When the instructor left for meal, the security staff asked the instructor about the condition of the recruit that they had accompanied in the freight elevator. The security guard described the recruit as the Complainant. Neither the instructor nor the security staff had met the Complainant prior to November 19, 2004. The security guard offered to help take the recruit down on the freight elevator at the end of the day. The instructor informed the sergeant in charge of the workshop, who also did not know the Complainant, of the incidents. Three security guards, an instructor, and an actor from the scenario identified the Complainant as exhibiting fear or agitation over being in an enclosed space, all of whom had never met the Complainant before that date.

The sergeant privately asked the Complainant about her behavior. She told the sergeant that she had been trapped in an elevator in 1999 and had suffered a panic attack because of it. Additionally, she stated that she prefers not to ride in elevators or on the subway. She further stated that in an emergency she can control herself because she does not have time to think. The complainant told the sergeant that she recently had to ride the subway with the rest of her company when her request to use her car had been denied. She stated that although she was uncomfortable, she was able to gain control of herself while in the subway by talking to herself. Complainant told the sergeant that she had been treated for claustrophobia, but did not disclose it to the NYPD during the application process. She further stated that if she was assigned to the Housing Bureau and was required to do vertical patrols (patrol of the stairwells from the top to the bottom of high rise buildings), she would walk up the stairs. Complainant stated that she would not want to be assigned to the Transit Bureau to patrol the subways. The sergeant notified the Commanding Officer of the Police Academy of these events. This information was forwarded to the Psychological Service Section of the NYPD.

On November 26, 2004, the Complainant was re-evaluated by a staff psychologist regarding the events of November 19, 2004 and as a result of her failure to disclose this information during her application process. She denied making any statements that she was claustrophobic at the workshop. The reports of a security guard, the instructor, and the sergeant of the Complainant's grave difficulty with elevators and her admission of claustrophobia led the staff psychologist to question the Complainant's credibility and ability to tolerate the stress of police work.

On the evening of November 26, 2004, the Complainant was placed on restricted duty status pending psychological evaluation. A recruit cannot graduate the Police Academy while on restricted duty. Recruits who are on restricted duty status due to psychological reasons are not issued firearms. Furthermore, if a firearm had already been issued, a psychologist may order the firearm to be removed from the officer. Therefore, the Complainant was placed on "hold" from graduating with her class from the Police Academy (a.k.a. "held over") until further notification.

–3–

D3

Twenty-one recruits, including both minority and non-minority men and women, were placed on hold from graduating from the Complainant's Police Academy class. Recruits can be placed on hold for many reasons including investigative reasons, pregnancy, psychological holds, and injuries. "Hold-over" recruits are generally assigned administrative tasks according to their abilities. Prior to special events, light custodial tasks are assigned to hold-over recruits who are not medically incapable. This is also true of full duty recruits during the scheduled Academy class. Arbitration by the NYPD allows the Department to have police officers perform custodial work because police officers duties are not limited to enforcement or administrative duties.

After the other recruits had graduated, the Complainant continued to attend the Police Academy with the other holdover recruits. Her supervisors were comprised of both male and female lieutenants and sergeants. She was assigned to a supervisor in January 2005, to assist with a disorder control plan, involving measuring the building and providing maintenance statistics. This would include the necessity of counting different fixtures, such as toilets and showerheads. The Complainant was required to tell a supervisor whenever she was ordered to leave the building for any reason. Complainant was removed from working on the disorder control plan because she was unsatisfactory in her position. She was reassigned by a female supervisor to perform data entry.

On February 7, 2005, the Psychological Services Unit recommended that the Complainant be separated (dismissed) from police work. There was sufficient evidence to conclude that Complainant suffers from a significant fear of enclosed spaces, specifically elevators and trains, which would interfere with her ability to perform full duty police work. On March 8, 2005, the Commanding Officer of the Medical Division endorsed both the staff psychologist's and the Director of Psychological Services' recommendation that the Complainant was not suitable for police work. This was forwarded to the Chief of Personnel on March 24, 2005.

On March 28, 2005, Complainant filed an OEEO complaint with the Department. Although her complaint does state that she was being treated differently than other similarly situated non-minority and male officers, she based her allegations on her belief that her assignments were designed to embarrass her and hasten her termination. She alleged that she was ordered to clean bathrooms, count toilets and run personal errands for an unnamed male supervisor. The OEEO office wrote to Complainant's attorney on March 29, 2005, to request an interview with the Complainant.

On March 31, 2005, the Chief of Personnel forwarded his endorsement of termination of the Complainant due to the assessment of the Psychological Services Section to the First Deputy Commissioner. On April 1, 2005, the First Deputy Commissioner of the NYPD forwarded his recommendation to the Police Commissioner to terminate the services of the Complainant.

On April 6, 2005, OEEO requested information from the Police Academy. The complaint was administratively closed by OEEO in May of 2005 after numerous unanswered attempts to Complainant's attorney were made seeking an interview with the Complainant. Neither the Complainant nor her attorney ever followed up with her complaint.

Complainant's appointment to the Department was conditioned on a two-year probationary period, during which time she was subject to termination without cause and without a hearing. In accordance with the City's Personnel Rules and Regulations, "the probationary term is extended by the number of days when the probationer does not perform the duties of the position, for example: restricted duty status, limited duty status, annual leave, sick leave, leave without pay, . . . provided, however, that the agency head may terminate the employment of the probationer at any time during any such additional period." 55 RCNY 5.2.8 (b). Based upon the results of the psychological re-evaluation, Complainant was notified that her services as a Probationary Police Officer were terminated by the Police Commissioner, pursuant to the New York City Personnel Rules and Regulations on April 15, 2005. 55 RCNY 5.2.7

## DISCUSSION

## I.    COMPLAINANT'S CHARGES OF DISCRIMINATION AND RETALIATION

Complainant is unable to establish a prima facie case of retaliation on the merits. Both discrimination and retaliation claims are analyzed using the three-step burden shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The complainant must first establish a prima facie case of discrimination or retaliation. Once the complainant meets that initial burden, the employer must present a legitimate, non-retaliatory reason for taking the action in question. If the employer articulates a non-discriminatory reason for the employment decision, the employee bears the ultimate burden of proving that the employer's explanation is merely a pretext for actual retaliation. See Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998); Holt, v. KMI-Cont'l Inc., 95 F.3d 123 (2d Cir. 1996).

Complainant's charge of retaliation cannot be substantiated by the evidence and should be dismissed for the following reasons:

### Complainant Fails to State a Prima Facie Case of Retaliation

Complainant falsely alleges that she was terminated in retaliation for reporting alleged discriminatory conduct practiced by the NYPD. To establish a prima facie case of retaliation under Title VII, the Complainant must generally establish that: 1) she participated in a protected activity; 2) the employer was aware of that activity; 3) the employer subjected the employee to some adverse employment action; and 4) there was a causal connection between the protected activity and the adverse employment action. Galdierc-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Although the Complainant did file an OEEO complaint with the NYPD's Office of Equal Employment Opportunity (OEEO), she fails to satisfy all of the remaining elements.

D5

Complainant fails to show that there was a causal connection between her OEEO complaint and her termination. First, the NYPD did not terminate her in bad faith. Additionally, the extensive chain of review for terminating a probationary police officer began almost two months prior to the Complainant's OEEO complaint. Complainant fails to show how her termination due to psychological reasons was in retaliation for her OEEO complaint that she made after the termination process had begun.

The NYPD had just cause to terminate the Complainant. She did not meet the psychological standard for a police officer set by the NYPD for all police officers. Although the Complainant had initially passed the written and oral psychological examination during the application process, her behavior while attending the workshop on November 19, 2004, demonstrated that she required further psychological evaluation. Police officers are required on a daily basis to enter elevators, subways, and large crowds. When an officer is unable to respond to an emergency or help his/her partner because of a fear of small spaces, the life of the officer, her fellow officers, and the public are placed in danger.

A security guard, an instructor, and a supervisor of a workshop all reported that the Complainant admitted that she was claustrophobic and scared of small, confined spaces. All of these reports came from people who did not know the Complainant prior to the day of the incident. Complainant's allegation that Sgt. Patel, the supervisor of the workshop, accused her of having a fear of confined spaces for no reason is clearly disproved by the numerous reports from different sources of her behavior that day-sources that had no reason to lie. Complainant even talked about a specific incident in 1999 that started her fear of confined spaces. This further indicates that the Complainant was not honest in her original psychological interview when the psychologist specifically asked her whether she had any special fears such as claustrophobia. Although the Complainant once lived on the 21st floor of a building and worked for an airline, both were discontinued not long after the 1999 incident.

Regardless, the question is whether the Complainant can perform the essential functions of a police officer now. Clearly based on her reactions in the elevator and during the role play on November 19, 2004, she would not be able to do so. Although the Complainant claimed that she could control her fear during an emergency by talking to herself, she could not help herself during a simple exercise where no one's life was at risk. Furthermore, this fear would be a distraction to the task at hand during a real emergency that would endanger everyone involved.

The NYPD properly investigated the reports of the Complainant's behavior the first time it was alleged. Prior to November 19, 2004, the Complainant's claustrophobia was not an issue because recruits are not allowed to use the building's elevators at the Police Academy, they must utilize the stairwells. The NYPD was first put on notice of the Complainant's condition on November 19, 2004. As discussed above, claustrophobia is a dangerous condition for a police officer to have. Furthermore, Complainant makes no allegations of discrimination prior to the incident on November 19, 2004. The Complainant provides no evidence that her termination was made in bad faith.

In addition, Complainant's allegation that her termination was a result of her OEEO complaint is not plausible. Termination of a probationary police officer must pass an extensive chain of review before the officer is actually terminated. Complainant made her complaint on March 28, 2005. On November 26, 2004, four months prior to her termination, the NYPD psychologically re-evaluated the Complainant. On February 7, 2005, the staff psychologist recommended that the Complainant be separated by the Department. This began the chain of review that would ultimately lead to the Complainant's termination. By the time she made her OEEO complaint, the Director of Psychological Services and the Commanding Officer of the Medical Division had already endorsed her termination. The NYPD has the right to rely on the advice and expertise of its staff psychologists. Therefore, with Psychological Services endorsing the termination, the Complainant's termination process was set forth well before her OEEO complaint. This belies Complainant's allegation that her termination was in retaliation and response to her OEEO complaint and allegations.

## Complainant Fails to State a Prima Facie Case of Discrimination

The complainant must first establish a prima facie case of employment discrimination by showing that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered some adverse employment action; and (4) that action took place under circumstances that give rise to an inference of unlawful discrimination. Although it is not disputed that Complainant is a member of a protected class, he cannot satisfy the remaining elements required.

To satisfy the third prong of the test set forth above, the Complainant must prove that she was subjected to an "adverse employment action." In the Second Circuit, an employee may suffer an "adverse employment action" if there is a "materially adverse change in the terms and conditions of employment." Richardson v. N.Y. State Dep't of Correctional Services, 180 F.3d 426 (2d Cir. 1999). A material adverse change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibility, or other indices... unique to a particular situation." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636 (2d Cir. 2000).

It is not disputed that Complainant was placed on restricted duty, and subsequently terminated, for not being psychologically fit to perform all essential duties required of a full duty police officer. As indicated in more detail below, the actions taken by the Department were legitimate and in accordance with statutory and Department regulations. Regardless, many of the other actions claimed by Complainant in her charge of discrimination do not rise to the level required for an adverse change in employment conditions.

Complainant's employment status did not adversely change. She remained in the same position as prior to being restricted. Although Complainant states that she did not receive her gun and shield with her classmates, she did not possess a firearm prior to

**D7**

being placed on restricted duty. She received the same pay while in the identical rank of probationary police officer. Claimant did not graduate with her class because her actions required re-evaluation of her psychological suitability for police work. The NYPD has the right to rely on the opinions of its psychologists. The NYPD's psychological unit deemed that further evaluation of the Complainant was necessary prior to being issued a firearm. A probationary police officer cannot graduate from the Police Academy without being on full duty status.

Complainant fails to demonstrate that she was treated differently than any other recruit who was "held over" from graduating the Police Academy. She specifically states that other recruits cleaned the gym with her on January 12, 2005. She does not establish that the other recruits were all minority or female. Furthermore, the NYPD is not contractually prohibited from utilizing police officers for custodial purposes. The Complainant also describes measuring and counting of fixtures, which were to be used to redraw floor plans. This is an administrative function, not an adverse job action. Complainant provides no specific evidence to corroborate her baseless allegations, nor is there anything to indicate that the alleged assignments were race-related.

Nor can Complainant satisfy the remaining prong to establish a prima facie case of discrimination. Her assertion that males and non-minority members of the Department were treated more favorably is simply incorrect. Complainant fails to provide the names of similarly-situated males or non-minority members of the Department who graduated from the Police Academy or were not placed on psychological hold after displaying similar aberrant behavior. Complainant makes baseless allegations that do not prove that the actions of the Department were based on race/color, national origin, or gender at all. The Department's action was necessitated by the Complainant's own behavior.

It is clear from the circumstances that the actions of the Department do not rise to the level required to prove a prima facie case of employment discrimination. Since Complainant cannot satisfy these elements, her charge of discrimination must fail.

### The Department has Expressed Legitimate, Non-Retaliatory Reasons for the Actions in Question

Assuming that Complainant was to establish a prima facie case of retaliation, the burden would then shift to the employer to rebut this presumption by articulating "some legitimate nondiscriminatory reason for the adverse action." McDonnell Douglas, 411 U.S. at 802. In this case, it was Complainant's own behavior that was the direct cause of any action taken against her. As indicated above, Complainant displayed severe anxiety when asked to enter an elevator on November 19, 2004. Three different reports attested to her behavior. On that same day, she became agitated and defensive while participating in an exercise in a small, crowded space. Additionally, a report of a prior incident surfaced while the Complainant had tried to avoid taking the subway. She admitted to at least three different people who she had not met prior to the incident that she was claustrophobic and scared of small spaces. She told her supervisor that she had not previously disclosed this information to the NYPD when the staff psychologist

-8-

specifically asked her whether she had any special fears during her initial interview. This initiated Psychological Services' re-evaluation of the Complainant. This in itself demonstrated that the credibility of the Complainant was questionable. Complainant was not dismissed until the matter had been reviewed through the chain of command. At all times the Department's actions were appropriate and in accordance with the established procedures. These actions were not based on any retaliatory or discriminatory motive but were a valid exercise of business discretion.

## Complainant Fails to Demonstrate that the Actions of the Department Were Pretext for Discrimination

Should the employer carry this burden of proving a legitimate, nondiscriminatory reason for its decision, the third stage of the McDonnell Douglas framework allows the complainants a full and fair opportunity to prove that the employer's justification for the adverse employment action was a pretext for discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Complainant has made no such showing and therefore cannot meet the ultimate burden of persuading the fact finder that she has been the victim of intentional discrimination.

## CONCLUSION

Based on the reasons discussed above, Complainant has failed to present any evidence that she was retaliated against. The Department has demonstrated that it acted appropriately under the circumstances and that any action was for a legitimate, non-discriminatory purpose. Accordingly, the Department requests that Complainant's charges be dismissed.

Sincerely,

Lori Workstel
Agency Attorney

-9-

D9

04.12.2007

Dr. M. Creagh-Kaiser

2    of the objection I will place it on

3    the record.

4         MR. SANDERS:   You will learn the hard

5    way. You will get sanctions for this

6    kind of stuff, trust me, if you keep

7    this up.

8    Q    Dr. Kaiser, let me just ask you this.

9         Do you remember seeing a statement

10   from Police Officer Moore of the police academy

11   about riding the elevator with Police Officer

12   Nunez?

13   A    I thought that I did, but.

14   Q    Did you see it in this file?

15   A    I thought that I did.

16   Q    Have you ever seen Plaintiff's Exhibit

17   1 which is a Charge of Discrimination?  Have you

18   ever seen this document?  Have you ever seen this

19   document prior to this deposition today?

20   A    I don't know if this is what I saw but

21   I feel like I saw something similar.

22   Q    You don't recall if you saw this?

23   A    This is not -- I don't recall if I saw

24   this.

25   Q    You left the Police Department in

1      Dr. M. Creagh-Kaiser

2  what, in December 2005?

3      A      December 2005.

4      Q      This charge was written in May of 2005

5  so you were still employed by the Police

6  Department; right?

7      A      Correct.

8      Q      Do you remember if anyone from the

9  legal bureau ever contacted you about her

10  allegations against the Police Department?

11      A      No.

12      Q      For perceiving her as being a

13  claustrophobic?

14      A      No.

15      Q      And it is not true according to the

16  plaintiff.

17          Did you ever speak to Lori Workstel of

18  the legal bureau, agency attorney for the NYPD?

19      A      No.

20      Q      What made you leave the employment

21  with the NYPD in December of 2005?

22      A      Because my husband and I wanted to

23  start a family and at that time we had moved not

24  too long before that and the commute was very

25  long. So we didn't want to be pregnant having

P. ZWEIBEL

1

2     asking you based on upon your training

3     experience as a supervisor at that time,

4     would you have remained her as an

5     employee?

6                    MR. MENDEZ: Objection, it

7          calls for speculation, that's a

8          form objection.

9          Q        I'm asking as a

10    supervisor.

11         A        As a supervisor just based

12    on her performance that I'm aware of.

13         Q        No grades or anything else?

14         A        Yes, I would have.

15         Q        Did anyone ever bring to

16    your attention that she was removed from

17    the disorder control plan because she was

18    unsatisfactory in her position?

19         A        Could you rephrase that.

20         Q        Did anyone ever bring to

21    your attention that she was removed from

22    the disorder control plan because she was

23    unsatisfactory in her position?  Did

24    anyone ever tell you that?

25         A        She was never in the plan,

1                     P. ZWEIBEL

2   I don't understand the question.

3        Q        You were named as a

4   defendant or respondent in an officer

5   equal opportunity charge that was written

6   against you?  Did you ever see that

7   before?

8        A        No.

9        Q        I'm going to do something.

10  I'm going to ask you to read this.  I'm

11  going to give you the OEEO charge.  I'm

12  going to show you the City's response.

13                What I am going to do, I'm

14  going to mark this as Exhibit 1.

15  Plaintiff's Exhibit 1. This is going to

16  be a charge of discrimination that was

17  filed with the equal employment

18  opportunity commission and one of the

19  responsibility's name is Lieutenant

20  Zweibel.  His name is on page one and

21  this is going to be -- basis bait

22  standard on 5/2, 5/3/2006 and it was

23  number two.  That's five, 3-A a charge of

24  discrimination document.

25                (Whereupon, Plaintiff's

                         P. ZWEIBEL

2          Exhibit 1, charge of

3          discrimination, was marked for

4          identification, as of this date.)

5          Q         Did you ever see that

6   document before?

7                    MR. MENDEZ: Go ahead.

8          Q         Have you ever seen that

9   document before?

10         A         Who?

11         Q         Has anybody from the New

12  York City Police Department or the legal

13  bureau of contacted you with respect to

14  that charge?

15         A         Not that I recall, no.

16         Q         Well, did you ever see the

17  charge?

18         A         This is the first time I've

19  ever seen this piece of paper.

20         Q         You don't remember if

21  anyone ever spoken you about that charge

22  before from the legal bureau?

23         A         No.

24         Q         So if the Police Department

25  filed a position statement with respect

P. ZWEIBEL

1
2   to that you being named as a respondent,
3   you have knowledge of that?
4       A       No.
5       Q       Your name on that charge
6   document, the first name as a respondent?
7       A       Where he.
8       Q       To the best of your
9   knowledge, that means that you're being
10  sued of some sort of discrimination;
11  right?
12      A       Yes.
13      Q       As being a person and a
14  crude of some sort of discrimination, you
15  would like an opportunity to defend
16  yourself; right?
17      A       Yes.
18      Q       If you're being discharged
19  with discrimination, you want to know
20  about that charge; correct?
21      A       Yes.
22      Q       Do you know why the Police
23  Department never contacted you about your
24  alleged misconduct?
25      A       No.

                        P. ZWEIBEL

1

2          Q          As you sit here today, this

3     is the first time you've seen that

4     charge; right?

5          A          Yes.

6          Q          Do you see in the second

7     page, I believe it is, let's see this

8     real quick, do you see in the second page

9     where -- let me ask you a question.

10                    Do you know a Sergeant

11    Rissoto of the counsel unit?

12         A          Yes.

13         Q          How do you know Sergeant

14    Rissoto?

15         A          From being in the Academy.

16         Q          Do you know her personally?

17         A          No.

18         Q          Just from the Academy?

19         A          A professional

20    relationship.

21         Q          On the second page, you see

22    this in reference to January 10th, 2005,

23    at twelve o'clock, do you know a

24    Lieutenant Carabetta?

25         A          Yes, I do.

1              P. ZWEIBEL

2         Q         How do you know Lieutenant

3  Carabetta?

4         A         He works at the Police

5  Academy.

6         Q         He works in what unit;

7  though?

8         A         Investigations.

9         Q         As part of his

10  responsibilities in investigations, does

11  it have anything to do with cleaning the

12  building at 235 East 20th Street?

13         A         Everyone in the building is

14  responsible for their area, so that could

15  be clean of his area or the areas that

16  he's responsible for.

17         Q         Well, okay. I want to point

18  you to January 10th, 2005 and the charge

19  on the second page, it says on or about

20  January 10th, 2005, at or about twelve

21  p.m. --

22              MR. MENDEZ: Could you make

23         copies so he can look at this.

24              MR. SANDERS:  I'm going to

25         give it back from you.

1                    P. ZWEIBEL

2        A         I was ordered to measure

3    the entire fifth floor of the Academy

4    along with another Police Officer Chris

5    Santoro at or about one o'clock p.m., I

6    was ordered to clean two rooms on the

7    fifth floor by Lieutenant Carabetta upon

8    information and belief other none unit

9    members of Academy were treated

10   differently.

11       Q         If he's part of the unit

12   and he's called of the investigation

13   unit --

14       A         The investigation.

15       Q         It's part of his duties and

16   responsibilities to order recruits to

17   clean the fifth floor of 235 East 20th

18   Street?

19       A         It could be, yes.

20       Q         Why?

21       A         Because if it was dirty he

22   could have recruits clean it.

23       Q         Based on what?  Isn't part

24   of your job as a security coordinator to

25   to ensure the building is clean; right?

P. ZWEIBEL

A       Yes.

Q       And you have a custodial staff for that, right; Lieutenant Zweibel?

A       Yes.

Q       Then how is it Lieutenant Carabetta who was in charge with integrity code order recruits to clean the building?

MR. MENDEZ: Objection to the form of the question.

You can answer.

A       could you rephrase it?

Q       I'm asking you if your duties and responsibilities are specifically for the site and security of 235 East 20th Street, how is it that Lieutenant Carabetta who is in charge of the integrity code order a recruit to clean any part of the building of 235 East 20th Street?

MR. MENDEZ: Objection to the form of the question.

You can answer?

                    P. ZWEIBEL

     A          Because if it's an area
that he's responsible for.  My custodial
are only responsible for the main part of
the general area.
     Q          What floor is the integrity
unit on for the recruits?
     A          The fifth floor.
     Q          The middle of the floor,
okay. And the custodians don't clean up
on fifth floor?
     A          Yes, they do, but they go
into individual offices.
     Q          That charge says that she
was required to clean the entire fifth
floor, see what it says, January 10th,
2005?
     A          No, it says two rooms of
the fifth floor by the lieutenant.
     Q          And before that also?
     A          That would be later.
Before that.  She was ordered to measure.
     Q          Right, so you're saying
that Lieutenant Carabetta could order her
to clean two rooms?

1                     P. ZWEIBEL

2          A          Yes.

3          Q          That's based on what?

4          A          Whatever he wants them to

5    do.

6          Q          Okay, because I don't have

7    that many custodians, we sometimes do

8    that.

9          Q          Has anything in the

10   collective bargaining agreement of the

11   police officer, that she should be

12   performing?

13                    MR. MENDEZ: Objection.

14         A          I don't know.

15         Q          Has that issue ever been

16   arising before by the units for example

17   D.C. 47 where the medication of the

18   service are being civilian tasks?

19         A          Never.

20         Q          You never heard that

21   before?

22         A          No.

23         Q          Going down further, there's

24   an allegation against you?

25         A          DC 37 -- see where it says

1                    P. ZWEIBEL

2   your name basically on January 28th,

3   2005?

4        A        Yes.

5        Q        Do you recall that

6   incident?

7        A        Again, not the exact date,

8   but she did put the information into an

9   Excel spreadsheet, but I don't remember

10  the date.

11       Q        If you remember a

12  responsibility and you're being accused

13  of improper employment practice,

14  discrimination, you would like to know

15  that you're being accused of that; right,

16  so you could respond to it?

17       A        On ordering her into an

18  Excel spreadsheet.

19       Q        Well, that's a bunch of

20  different things, Lieutenant and what I'm

21  asking you if you remember a

22  responsibility that and one of the things

23  she's alleging that she's being told to

24  enter this information into an Excel

25  spreadsheet, all right, which it has to

1          P. ZWEIBEL

2  do with the girl comment and everything,

3  would you like to have known about it so

4  you could have defended yourself?

5          A        Yes.

6          Q        What about the next comment

7  there about re-drawing these floor plans

8  over again?

9          A        Yes.

10         Q        Would you have like to have

11 been able to know about her accusing you

12 of having to engage of re-drawing floor

13 plans over and over again, do you think

14 you would like to have known about that,

15 Lieutenant Zweibel, so you could defend

16 yourself?

17                  MR. MENDEZ: Objection to

18        the form of the question.

19                  You can answer.

20         A        If there's anything to

21 defend.

22         Q        If she's confusing you of

23 treating, you're treating her like your

24 girl and she's doing certain police work,

25 do you have to defend yourself?

1                    P. ZWEIBEL

2        A        Yes.

3        Q        You didn't know about that,

4  did you?

5        A        No.

6                 MR. SANDERS:  I would like

7        to mark this as Plaintiff's Exhibit

8        2.  This is going to be the

9        response to that charge, the time.

10                MR. MENDEZ: Do you have a

11       copy of it?

12                MR. SANDERS:  I'm going to

13       give you an opportunity to read it

14       and I'm going to give you copies of

15       it.

16                MR. MENDEZ:  I would like

17       to read it as you're reading it.

18                MR. SANDERS:  Mr. Mendez,

19       please already.  Have I tried to

20       trick you, have I tried to deceive

21       you?

22                MR. MENDEZ: I would like to

23       look at the document.

24                MR. SANDERS:  I'm going to

25       mark it, you take a look at it.

1     P. ZWEIBEL

2    MR. MENDEZ: Could you make

3  a copy of it for us.

4    MR. SANDERS:  I'm giving

5  you a copy of it afterwards.

6     (Whereupon, Plaintiff's

7  Exhibit 2, response, was marked for

8  identification, as of this date.)

9    MR. SANDERS:  This is going

10  to be the OEEO response to the

11  period of time. This is to go to be

12  to Mr. Peter Hands.  A Police

13  Department legal bureau document.

14  Q  You could go over it with

15 your attorney, take a look at it.

16    Have you ever seen that

17 position statement by the Police

18 Department?

19  A  No.

20  Q  Have you ever spoken to

21 Laurie?  Does she work still?

22  A  If I remember right, she's

23 the agency attorney.

24  Q  Have you ever spoken to

25 her?

P. ZWEIBEL

1

2          A          Not that I recall.

3          Q          Not that you could recall

4    or have you ever spoken to anybody from

5    legal?

6          A          I talk to people from legal

7    a lot, so I don't know that particular

8    name.

9          Q          I'm asking about Police

10   Officer Nunez, though.

11         A          No, I don't recall that.

12         Q          That charge, you agree is

13   in response to the position's statement,

14   is this response to this charge and no

15   one spoken to you to the best of your

16   recollection; right?

17         A          I don't remember specific

18   names or anybody.

19         Q          Has anyone spoken at all

20   about this case prior to you speaking to

21   Corporation Counsel?

22         A          About this case, no.

23         Q          Now, I want to ask you some

24   specification about this response.  Now I

25   asked you earlier about whether or not

P. ZWEIBEL

1

2      she was removed from some disorder

3      control plan; right?

4           A        Right.

5           Q        Take a look at this

6      document on D4 which was marked by the

7      City and Bates stamped on the bottom,

8      like look at that?

9           A        Okay, I read it.

10          Q        Okay.  Do you see where the

11     response has to do with Police Officer

12     Nunez had to be removed from the disorder

13     control plan, whatever that is?

14          A        Yes, I see that.

15          Q        Was she ever removed from

16     your direct supervision?

17          A        Yes, there were days that I

18     wouldn't get her every single day.  I

19     don't understand.

20          Q        As a general rule, she was

21     assigned to your office most of the time;

22     right?

23          A        Fairly regularly.

24          Q        Was she ever removed from

25     your office to do any misconduct on the

1                          P. ZWEIBEL

2    part of Police Officer Nunez?

3         A          Not that I'm aware of.

4         Q          That's no, right?

5         A          She wasn't removed from

6    your office, was she?

7                     MR. MENDEZ: He said not

8         that he's aware of.

9         Q          Let me ask you this way,

10   you met her on what, January, 2005?

11        A          That's what you said, yes.

12        Q          She was assigned to your

13   office on a regular basis; right?

14        A          Fairly regular basis, yes.

15        Q          Consistently; right, more

16   than three times a week?

17        A          I would say about three

18   times a week.

19        Q          More than four times a

20   week?

21        A          I'm not sure about that.

22        Q          How about five times a

23   week?

24        A          I would not recall.  It was

25   rather frequent.

P. ZWEIBEL

1

2      Q        Did anyone ever tell you

3   that she was going to be removed from

4   your office because she's engaged in

5   misconduct?

6      A        No.

7      Q        Did anyone ever tell that

8   you she could not work in your office

9   because of misconduct?

10     A        No.

11     Q        Did anyone before tell you

12  that she was removed from a previous

13  assignment and placed in your office

14  because of any misconduct?

15     A        No.

16     Q        So as you sit here today as

17  a respondent in this charge, do you know

18  what I'm -- if you don't know, you don't

19  know. I'm asking but this now, the

20  claimant refused to tell a supervisor

21  where she was ordered whether she was

22  ordered to leave the building for any

23  reason.

24              Do you know anything about

25  that?

1                    P. ZWEIBEL

2          A          She was required to tell

3    the supervisor, yes.

4          Q          I understand.  But did she

5    ever leave the building without telling

6    any supervisors?

7          A          I don't believe so, no.

8          Q          I'm talking about you now,

9    did she ever leave the building without

10   telling you personally?

11         A          I wouldn't have any

12   knowledge if she left the building.

13         Q          Was she ever assigned from

14   her assignment that you're aware of?

15         A          Not that I recall, no.

16         Q          Because you testified

17   earlier she was always to work on time?

18         A          Right.

19         Q          And performed her job

20   average or above average; right?

21         A          Yes.

22         Q          So now when the City

23   responds and it says here complainant was

24   removed from working on the disorder

25   control plan because she was, you know,

1                    P. ZWEIBEL

2    satisfactorily in her position, do you

3    know what that means?

4           A        No, I don't.

5           Q        You don't know where that

6    attorney got that information; right?

7           A        No.

8           Q        And the disorder control

9    plan was part of your responsibility;

10   right?

11          A        Part.

12          Q        And that was the site and

13   security of the building; right?

14          A        Yes.

15          Q        Who had the other part of

16   the disorder control plan?

17          A        Different units.

18          Q        As far as you are concerned

19   with the duty and security aspect of it,

20   she always worked with you; right, when

21   she was in your office?

22          A        Not always, but frequently.

23          Q        Frequently?

24          A        Yes.

25          Q        More than three times a

P. ZWEIBEL

week, at least three times a week?

A        She say around three times

a week.

Q        Based on your memory or

your interaction, she was never removed

for being you know satisfactorily

employee is; right?

A        Not that I was involved in,

no.

Q        That's what I'm asking, she

wasn't removed from you?

A        No.

Q        Do you know if she was ever

assigned to a female supervisor?

A        I have no knowledge of it,

but I would assume when she wasn't with

me.

Q        Don't assume, I'm asking

you do you know.

A        No.

Q        Do you know if she was ever

assigned to a female supervisor?

A        No.

Q        As far as you know, she was

1                    P. ZWEIBEL

2    always assigned when you saw her at

3    least, to your understanding?

4         A      Yes.

5                 MR. SANDERS:  Let's take

6         one quick moment.

7                 (Whereupon, a break was

8         taken off the record.)

9         Q      It's your testimony that

10   you never saw the position statement?

11        A      Yes.

12        Q      No one from psychological

13   services ever called you so ask you about

14   the evaluation of Police Officer Nunez?

15        A      No.

16        Q      And you don't recall riding

17   the elevator with Police Officer Nunez?

18        A      I don't recall it, but I

19   must have done it at least once.

20        Q      Done it more than once?

21        A      I will say, yes.

22        Q      More than three times?

23        A      Maybe.

24        Q      Because I don't think you

25   as a lieutenant, you're not going to take

1                    Archibald

2    were assigned to the case.

3         Q.        So Corporation Counsel, you

4    believe you spoke to them on the telephone?

5         A.        I spoke to an attorney from Corp.

6    Counsel on the phone.

7         Q.        Did you go down personally to

8    100 Church Street to meet whoever the Corp.

9    Counsel was handling the case?

10        A.        Not in this case.

11        Q.        I mentioned you were one of the

12   name respondents in an EEOC charge in a case

13   filed by Rachel Rodriguez.  Have you ever

14   seen this Plaintiff's 1 EEOC charge filed

15   with the United States Equal Employment

16   Commission (handing)?

17                  (Witness reviewing document.)

18        Q.        Have you ever seen that charge

19   prior to today?

20        A.        I think I have.

21        Q.        When did you first see that

22   charge?

23        A.        I don't remember.

24        Q.        That was filed in what year, what

25   calendar year?  On the bottom there's a

1                    Archibald

2    signature in the front.

3          A.      The date at the bottom is

4    May 17th of 2005.

5          Q.      You don't recall seeing that EEOC

6    charge, at all, from 2005?

7          A.      No.  What I said was I think I

8    have seen it before but I don't remember when

9    I first saw it.

10         Q.      You saw the actual charge?

11         A.      I believe I've seen this document

12   before, this three-page document before, but

13   I don't remember when I first saw it.

14         Q.      Who do you think showed it to

15   you?

16         A.      I don't remember.

17         Q.      You are being named as a

18   respondent in that charge and you want to

19   defend yourself if you're being accused of

20   any misconduct or discrimination; isn't that

21   correct?

22         A.      Yes.

23         Q.      You would take a personal

24   interest in this because you could have civil

25   liability?

1                    Archibald
2          A.     I don't know if I have civil
3     liability.
4          Q.     I said you could have civil
5     liability.
6          A.     And I said I don't know.
7          Q.     There's a possibility that you
8     could be found liable in a case if you're
9     being sued?
10         A.     Yes.
11         Q.     You would think it's in your best
12    interest to defend yourself if someone's
13    accusing you of misconduct or a form of
14    discrimination; right?
15         A.     Yes.
16         Q.     As you sit here, you don't
17    remember whether or not you saw that charge
18    and when you saw it?
19              MR. MENDEZ:  Objection.  Asked
20         and answered.  She said she saw it twice.
21         Q.     You said you think you saw it;
22    right?
23         A.     Right.
24         Q.     You want to keep a copy, or at
25    least some document to try to defend yourself

1                    Archibald

2    when you see those types of charges; right?

3         A.      I don't understand the question.

4         Q.      If someone's accusing you of

5    misconduct or discrimination, you want to

6    collect documents, I'm just asking you, to

7    try to defend yourself?

8         A.      I might want to collect some

9    documents.

10        Q.      What documents would you collect?

11        A.      I might collect documents that

12   were related to the charge of discrimination.

13        Q.      Are you aware there was also an

14   internal EEO complaint filed against you?

15   Are you aware of that?

16        A.      I don't remember ever hearing

17   that.

18        Q.      Did you ever hear anyone from the

19   Deputy Commissioner of EEO, Neldra M.

20   Zeigler, did anyone from her office call you

21   up regarding discrimination filed against

22   you?

23        A.      I don't remember if anyone from

24   that office called me about this.

25        Q.      If they did call you, you would

1                    Archibald

2    remember it; right?

3        A.      Not necessarily.

4        Q.      Would you take note of it,

5    especially if you're being accused of

6    official misconduct and/or discrimination?

7        A.      If I were accused of official

8    misconduct, I would probably remember it

9    several years later, but I can't be sure.

10       Q.      Do you remember if anyone from

11   the legal bureau ever contacted you with

12   respect to that EEOC charge?  Did anyone ever

13   speak to you.

14       A.      I don't remember.

15       Q.      I'm going to ask you if you ever

16   saw this before, Plaintiff's Exhibit 2, which

17   is the Police Department Legal Bureau's

18   response to the EEOC charge in front of

19   Dr. Archibald.  I ask you to read this and

20   then I'm going to direct you to certain

21   portions of it that have to deal with

22   psychological examinations.

23               Let's see if you ever saw that

24   before.

25               (Witness reading document.)

1                    Archibald

2          Q.      You've had a chance to read it.

3    Have you ever spoken to that agency attorney,

4    Lori Workstill (phonetic)?

5          A.      I don't remember.

6          Q.      You don't remember if you spoke

7    to her; right?  And this is obviously

8    allegedly produced by her on July 27, 2005,

9    which is the same year that Police Officer

10   Nunez was terminated.  As a matter of fact,

11   within about seven months of her termination

12   in February, March, April, not too long

13   after.

14              Do you think it was fresh in your

15   mind back then?

16         A.      I don't know.

17         Q.      Let me just focus you on page

18   four, which is Bates stamped by The City of

19   New York D4, and the paragraph is that on

20   February 7, 2005, where according to Agency

21   Attorney Workstill, there was a

22   recommendation that Police Officer Nunez be

23   dismissed from police work because there was

24   sufficient evidence to conclude that

25   plaintiff suffers from significant fear of

1          Archibald

2    enclosed spaces, specifically elevators and

3    trains, which would interfere with her

4    ability to perform full duty police work.

5          Do you know where she got that

6    information from?

7          A.    Which paragraph?

8          Q.    February 7, 2005, where it says

9    there's sufficient evidence.

10         A.    Okay.

11         Q.    What evidence do you think she's

12   referring to?

13         A.    I don't know.

14         Q.    Well, she would have gotten that

15   information from the Psychological Services

16   Unit, you believe?

17         A.    Probably.

18         Q.    And the significant fears, do you

19   believe she would have received that

20   information also from Psychological Services?

21         A.    I don't know.   Probably.

22         Q.    But you don't recall speaking to

23   her personally?

24         A.    I don't.

25         Q.    How about Dr. Maureen

SALADEEN-PATEL          80

2    read back by the reporter.)

3              VIDEOGRAPHER:  We are back on

4    the record continuing the

5    deposition.  It's 11:18 a.m.

6              Mr. Sanders, please continue.

7         Q.    Okay.  Now, you are aware

8    there was a lawsuit filed in this

9    matter, in this case, against the police

10   department, including you as an

11   individually named defendant, right?

12        A.    Yes.

13        Q.    Now, to start a lawsuit you

14   need to -- you have to make a complaint

15   to the Equal Employment Opportunity

16   Commission and file what's called a

17   charge of discrimination.  There was one

18   filed in this case.  Have you ever seen

19   this charge of discrimination?

20              I am going to show you what's

21   previously marked as Plaintiff's Exhibit

22   1.  Have you ever seen this document

23   before (handing)?

24        A.    No.

25        Q.    Has anyone from the legal

1                    SALADEEN-PATEL                81

2      bureau contacted you with respect to any

3      allegations in that charge of

4      discrimination?

5          A.    No.

6          Q.    This is the first time you

7      have seen it, today?

8          A.    Yes.

9          Q.    And you are a named defendant

10     in this case, right?

11         A.    Yes.

12         Q.    And if you look on the second

13     page, you can flip it over, although

14     your name is not spelled properly,

15     that's you, right?

16         A.    Yes.

17         Q.    What does it say on that

18     charge of discrimination?

19         A.    Um, "On November 19, 2004,"

20     that?

21         Q.    No, on the -- your name is

22     written there, right?

23         A.    Saladeen is spelled with an

24     I.

25         Q.    Okay.  On page two, right?

1                    SALADEEN-PATEL                    82

2          A.     On page two.

3          Q.     And this is the first time

4     you've seen that document, right?

5          A.     Yes.

6          Q.     Okay.  So you didn't have an

7     opportunity to defend yourself in this

8     charge of discrimination, right?

9          A.     No.

10         Q.     Okay.  Now, when the charge

11    of discrimination is filed, the police

12    department or employee file what's

13    called a position statement.  And this

14    is going to be Plaintiff's Exhibit

15    Number 2.  And it was filed with the

16    Equal Employment Opportunity Commission

17    by a Laurie Workstel, W-O-R-K-S-T-E-L,

18    and she's an agency attorney with

19    N.Y.P.D.

20              Have you ever seen this

21    position statement with respect to the

22    allegations made by Police Officer Nunez

23    against yourself and the other

24    defendants in this case?

25         A.     I don't think so.

1                    SALADEEN-PATEL                    83

2          Q.     Has anyone ever called you

3     from the legal bureau asking you any

4     questions with respect to the November

5     19, 2004, incident?

6          A.     Other than Ms. Rippi Gill.

7          Q.     Okay.  You are a named

8     defendant in this case, right, Sergeant

9     Patel?

10         A.     Yes.

11         Q.     And you would like an

12    opportunity, of course, to fully defend

13    yourself, right?

14         A.     Yes.

15         Q.     Assuming there is liability

16    in this case, you could be personally

17    liable, right?

18         A.     I don't know.

19         Q.     Well, I'm just asking you,

20    assuming you are found liable, you could

21    have personal liability in this case

22    because you are being sued individually

23    as well as in your official capacity,

24    right?

25         A.     Okay, if you say so.

SALADEEN-PATEL                    84

 1

 2      Q.    Right?  It's on the lawsuit.

 3  Did you read it?

 4      A.    I didn't get -- I didn't get

 5  all of this.

 6            MS. GILL:  I think she -- you

 7      are referring --

 8      Q.    Okay.  I'm talking about the

 9  lawsuit.  Did you get a copy of the

10  lawsuit, the complaint?

11      A.    Yes.

12      Q.    Okay.  And your name is on

13  it, right?

14      A.    Yes.

15      Q.    And it says sued in your

16  official and individual capacity, right?

17      A.    I presume so.  I haven't

18  looked at it since it was sent to me.

19      Q.    That's in 2005, right?

20      A.    Right.

21      Q.    And you are a named defendant

22  and you're not -- you didn't look at it

23  because you don't want to defend

24  yourself, is that what it is?

25      A.    No.

1                    SALADEEN-PATEL                    85

2              MS. GILL:  Objection.

3              MR. SANDERS:  It certainly is

4        not to form so you know already,

5        Miss Gill.

6        A.    As far as I knew, I did

7   nothing discriminatory so I wasn't

8   really worried about it.

9        Q.    Still -- you are not worried

10  about it but you are still accused of

11  wrongdoing, right?

12       A.    I guess so.

13       Q.    And you'd want to defend

14  yourself if you did nothing wrong,

15  right?

16       A.    Yes.

17       Q.    Okay.

18             MR. SANDERS:  Let me have

19        that position statement.

20       Q.    Now, what's your level of

21  education, Sergeant Patel?

22       A.    Um, 72 college credits and

23  I'm attending Manhattan College right

24  now to finish my bachelor's.

25       Q.    So you don't have a master's

**EXHIBIT 11**

# JEFFREY L. GOLDBERG, P.C.

### ATTORNEYS AT LAW

JEFFREY L. GOLDBERG

DANIEL B. GAZAN (1967-2001)
MARY B. ROCCO
CHESTER P. LUKASZEWSKI
ERIC SANDERS

2001 MARCUS AVENUE
LAKE SUCCESS, NEW YORK 11042
www.jlgoldbergpc.com

PHONE (516) 775-9400
FAX# (516) 775-4477

JENNIFER RIEHL
MARLENA MECCA

PARALEGALS

March 28, 2005

New York City Police Department
Office of Equal Employment Opportunity
One Police Plaza, Room 1204
New York, New York 10038

Re: <u>Continuing Course and Pattern of Discriminatory
Conduct Against Police Officer Rachel Rodriguez,
Tax Registry No.: 935413, Shield No.: 2990</u>

Dear Sir:

This firm represents Police Officer Rachel Rodriguez, with regard to claims arising from numerous violations of Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e-2, and 42 U.S.C. § 2000e-3; the Civil Rights Act of 1870, 42 U.S.C. § 1981; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988; New York State Executive Law § 296; and New York City Administrative Code §§ 8-107 and 8-502, visited upon her by employees and/or agents of the Police Department City of New York (hereinafter referred to as the "Department") that continue to this present day.

Upon information and belief, Officer Rodriguez is being improperly and illegally denied her property right to continue in her career as a full duty police officer. Currently, Officer Rodriguez is assigned to the police academy where she is on **"Restricted Duty"** and ordered to perform a number of menial and demeaning tasks. Theses duties and responsibilities include cleaning bathrooms, counting toilets, running personal errands for a male supervisor etc. There is absolutely nothing in the duties and qualifications of her civil service title or the duties and responsibilities as outlined in the collective bargaining agreement with the City of New York that authorizes the management to order her to **clean bathrooms, count toilets, run personal errands** for a male supervisor etc. It is Officer Rodriguez's position that such conduct is designed **solely** to embarrass her and to hasten her termination or coerce Officer Rodriguez into resigning from her position. It is Officer Rodriguez's position that she is not being treated the same as other similarly situated non-minority and male officers. We expect her to immediately be restored to full duty and assigned to a permanent command for field training.

As counsel, we expect to be notified of any and all developments in the resolution of

PLAINTIFF
EXHIBIT
#37

these claims. Moreover, since Officer Rodriguez is represented by this firm, we expect there to be no contact whatsoever made by any employees and/or agents of the Department in an attempt to detail, establish, mitigate or refute any charges outside the presence of counsel.1 Throughout this process, the complainant will remain ready, willing and able to assist the Department as it investigates her claims.

If you have any questions, please feel free to call the office. Thank you for your time and attention.

Sincerely,

Eric Sanders
Managing Attorney

ES/es

cc:    Deputy Commissioner of Legal Matters S. Andrew Schaffer (By Facsimile)
      Deputy Commissioner Training James J. Fyfe, Ph.D. (By Facsimile)
      Chief of Personnel Rafael Pineiro (By Facsimile)
      Commanding Officer Police Academy Deputy Chief Diana L. Pizzutti (By Facsimile)

---

1 **DR 7-104 [§1200.35] Communicating with Represented and Unrepresented Parties.**
A. During the course of the representation of a client a lawyer shall not: 1. Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

**POLICE DEPARTMENT**
**CITY OF NEW YORK**

**CONFIDENTIAL**

**INVESTIGATING OFFICER'S REPORT**

**From:** Detective Lee Ann Johnson          **Command:** O.E.E.O.

**Case#:** 0073s05

**Accompanying Investigator(s):** N/A

**Subject:** Confer with Sergeant St. James

**Time:** 1400 hrs          **Date:** 04/13/05

---

Related Enclosure Number(s)_____

      Sergeant St. James, Team Leader assigned this case to I/O for further investigation.

_____    _____    _____5-10-05_____
Investigator's Signature       Supervisor's Signature         Date

Worksheet Number: _____
Page _ of _

PLAINTIFF
EXHIBIT
#30

Lt. Coyle explained that for the most part any recruit that is a 'hold-over' is assigned to administrative tasks according to their individual abilities. She also related that Officer Rodriguez had been assigned to Lieutenant Zweibel in January 2005, to assist with a disorder control plan, involving measuring the building and providing maintenance statistics. This would include the necessity of counting toilets. However, according to Lieutenant Coyle, presently there is no 'clean-up' team assigned and to her knowledge there are no recruits assigned to clean bathrooms at this time. Additionally, Lieutenant Coyle said that her office (room # 523) is responsible for the whereabouts of each recruit. If for any reason, a recruit was ordered to leave the building, they would have to let a supervisor know where they were going in room 523 before they left.

Lt. Coyle recalled that Lieutenant Zweibel asked that officer Rodriguez be removed from his assignment because she was ineffective in her position. Furthermore, Officer Rodriguez was instructed to put her hat on and she refused. She related that she had a pimple on her forehead and did not want to wear the hat because it would hurt her. Lieutenant Zweibel related that if she was afraid to wear a hat because of a pimple, how would she be able to handle herself on patrol? Lieutenant Coyle reassigned Officer Rodriguez to Lieutenant Wahlig to perform data entry and was unable to supply any further information relative to this investigation.

_____
Investigator's Rank & Signature

_____
Supervisor Signature

_____1/13/05_____
Date

Worksheet Number _8_
Page _1_ of _1_

PS0149

## POLICE DEPARTMENT
## CITY OF NEW YORK

### CONFIDENTIAL

### INVESTIGATING OFFICER'S REPORT

**From:** Detective Jennifer Molinari                    **Command:** OEEO

**Case Number:** 073s05

**Accompanying Investigator(s):** N/A

**Subject: Conferral with Lieutenant Coyle, PA**

**Time:** 1400 Hours                          **Date:  04/07/05**

Related Enclosure Number(s) 4

I/O conducted a telephone conferral with Lieutenant Coyle, recruit operations, Police Academy. She related that currently there are twenty-one (21) Hold- overs assigned to the Police Academy.

Pregnancy - 6
Investigative - 2
Psychological - 2
Non-line of duty - 4
Line of duty- 7
minorities - 12
non minorities -9

**The unit comprises of :**
Lieutenant Burgos (Male)
Lieutenant Coyle (Female)
Sergeant Borja (Male)
Sgt. Harrison (Female)
Lieutenant Wahlig (Male)
Lieutenant Zwiebel (Male)

Police Officer Rachel Rodriguez is one of two recruits on Psychological review. Lt. Coyle indicated that Psychological services would be able to supply details surrounding the review. However, she said she believed that Officer Rodriguez's ability to perform the essential duties of patrol were in question. Lt. Coyle had general knowledge of an episode during an EDP workshop in which Officer Rodriguez was placed in a scenario that involved being in an elevator. The officer suffered a panic attack and was unable to perform the required scenario. At which time, the instructor prepared a UF-49 reporting her behavior and she was referred to psychological services.

WORK    # 8
PAGE    1  2

**EXHIBIT 12**

INCOMPLETE FILE

1               Archibald

2        A.     That's correct.

3        Q.     So somehow -- and I'm trying to

4    get you to reconcile these things because

5    once we pull out these other statements, I

6    want you to explain how these three

7    statements reconcile each other when you see

8    these three individuals got together and made

9    these statements up.

10             MR. MENDEZ:  Objection.

11       Q.     You're assuming this Sergeant

12   Patel's statements are accurate, but you

13   somehow say Police Officer Liz wasn't even in

14   the elevator?

15       A.     Shortly after we got this, there

16   was a note in the folder back in '04 that

17   someone had given us information that PPO Liz

18   may not have been there.

19       Q.     It's somewhere?

20       A.     I would have to see the note in

21   the record.

22             MR. SANDERS:  I'm going to make a

23       request for the entire psychological

24       profile, the front and back of the

25       covers, including all notes, because thus

Archibald

1
2  far there is no note suggesting that

3  Police Officer Liz was not in the

4  elevator, and so far in this deposition

5  all we have are these gratuitous

6  statements by Dr. Archibald as a

7  defendant, but she hasn't brought any

8  documents about her high GI score and the

9  guy wasn't in the elevator.

10       It's done by design.  The

11  plaintiff's trying to get information and

12  all they're doing is giving information

13  to support her theory.  We want the full

14  file.

15       MR. MENDEZ:  Taken under

16  advisement.

17  (Document requested.)

18       Q.    You're assuming that Police

19  Officer Akeno's information that she gave to

20  Sergeant Patel is accurate; right?

21       A.    Yes.

22       Q.    What's that based on?

23       A.    There was no reason to believe it

24  was not accurate.

25       Q.    What's the reason to believe that

Dr. M. Creagh-Kaiser

1

2    Q    This is the first time you have ever

3    been deposed?

4    A    Yes.

5    Q    Have you ever been sued before?

6    A    No.

7    Q    You had an opportunity to have a

8    discussion with counsel about this case?

9    A    Yes.

10    Q    When did you meet with counsel?

11    A    Yesterday, last night.

12    Q    In preparation for your deposition

13    today, what documents did you review?

14    MR. MENDEZ:    Objection.

15    Q    You can answer the question.

16    MR. MENDEZ:    No, I am directing her

17    not to answer.

18    MR. SANDERS:    Ivan, stop it already.

19    MR. MENDEZ:    You can ask her whether

20    documents have been reviewed but you

21    can't ask her what specific documents

22    we reviewed.    You cannot unless you're

23    asking to refresh her recollection.

24    MR. SANDERS:    Stop it.    Ivan, cut it

25    out already.    It's enough already.

Dr. M. Creagh-Kaiser

That is an improper objection. I can ask the witness what documents she reviewed. I cannot get into attorney client privilege which is what I will not ask you. All I am asking is what documents you reviewed, so guess what, if there is a document you reviewed that you are relying on I can ask you question about it. That is the purpose of asking you this question.

Q    What documents did you review?

MR. MENDEZ:    I will make a statement on the record.

MR. SANDERS:    Make a record.

MR. MENDEZ:    I will make a statement.

MR. SANDERS:    You're being an obstructionist.

MR. MENDEZ:    I will make a statement on the record.

Asking my client which documents we reviewed last night in the context of an attorney client discussion we had for her preparing for this deposition --

1          Dr. M. Creagh-Kaiser

2          MR. SANDERS: Did you hear me say

3          anything about discussion, counsel?

4          No.  I said documents.

5          MR MENDEZ: You can ask her whether

6          documents were reviewed.

7     Q    Did you review an entire psychological

8     profile in this case?

9          MR. MENDEZ:  Objection.

10         MR. SANDERS: Fine. Let's stop. Go off

11         the record.  We will call the

12         magistrate.

13         MR. MENDEZ: Okay, call the

14         magistrate.

15         MR. SANDERS: I am getting the

16         magistrate on the phone.  This is

17         ridiculous.

18         (Short break: 10:16 to 10:19)

19         (Whereby, Chief Magistrate Steven M.

20         Gold was called on the telephone.)

21         MR. MENDEZ: Good morning, Your Honor.

22         MR. GOLD:  I have got Mr. Sanders

23         and --

24         MR. MENDEZ: Ivan Mendez from the

25         Corporation Counsel, Your Honor.

Dr. M. Creagh-Kaiser

MR. GOLD: How are you?

MR. MENDEZ: Good, thank you.

MR. GOLD: Who is being deposed?

MR. MENDEZ: Dr. Maureen

Creagh-Kaiser, Your Honor.

MR. GOLD: Who is that relative to our

case?

MR. MENDEZ: She is a non-party

witness. She prepared part of the

psychological report of the plaintiff.

MR. GOLD: So she is an employee of

the New York City Police Department?

MR. MENDEZ: No, she is no longer an

employee of the Police Department,

Your Honor.

MR. GOLD: She was at the time of the

conduct about what she is being

questioned?

MR. MENDEZ: Correct.

MR. GOLD: What is the problem?

MR. SANDERS: This is Eric Sanders for

Rachel Rodriguez.

MR. GOLD: Yes, sir.

MR. SANDERS: I am trying to ask her

1       Dr. M. Creagh-Kaiser

2   questions with respect to what

3   documents she reviewed in preparation

4   for this deposition so I can find out

5   what they are and I can possibly cross

6   examine her on those documents and the

7   corporation counsel is objecting to

8   that alleging that it is attorney

9   client privileged. I am not interested

10  in what advice she received. Just the

11  documents.

12  MR. GOLD:  Right.

13  MR. MENDEZ:  Your Honor, it is my

14  position that under rule 612 he is

15  required to inquire as to whether the

16  witness's recollection has been

17  refreshed by specific documents but

18  not to inquire as to what all

19  documents that the witness reviewed.

20  MR. GOLD:  Rule 612 is a rule of

21  evidence, sir. It is not a rule of

22  discovery. That is about what is

23  admissible at trial. It is not about

24  what is discoverable. The documents

25  the doctor reviewed are discoverable

1        Dr. M. Creagh-Kaiser

2        which were shown to her by counsel and

3        which she chose to review on her own

4        is not. What the lawyer who showed her

5        documents if there was one told her

5        about them or asked her about them in

7        the context of an attorney client

3        relationship is not discoverable. What

)        thoughts they brought to mind and what

'        she remembered about the case after

         reviewing them is.

         I am overruling your objection subject

         to those limitations.

         Is there anything else I can do for

         you today?

         MR. SANDERS:  No, you have been very

         helpful, Your Honor.

         MR. MENDEZ:  Thank you, Your Honor.

         MR. GOLD:  Okay, have a good day.

            (Read Back)

    A    The documents that were copied in the

psychological file.

    Q    The file that the corporation counsel

delivered to plaintiff today?

    A    It is the file that corporate counsel

1          Dr. M. Creagh-Kaiser

2     had last night.

3          Q     Is this the file that he just gave to

4     me; do you know?  Is this the file that looks

5     familiar to you?  That is what I want to mark

6     right now as Plaintiff's Exhibit 17. And that is

7     going to be the file, the alleged file, of the

8     plaintiff's psychological profile maintained by

9     the NYPD which also I want to make a note it is

10    also incomplete. See if that is the documents you

11    recognize from last night or the night that you

12    reviewed it?

13         A     (Reviewed document).

14         Q     It looks familiar to you?

15         A     Yes, just making sure it continues to

16    be such; correct.

17               (Whereupon, Plaintiff's Exhibit 17,

18               Plaintiff's psychological file, 167

19               pages, was marked for identification.)

20         Q     If there is at any time during this

21    deposition you need to consult with your

22    attorney, you can consult with your attorney. The

23    only thing I ask for you to do is if I ask a

24    question, that you answer the question first and

25    then you can consult with him.

1          Dr. M. Creagh-Kaiser

2     A     Okay.

3     Q     These are the only documents that you

4   reviewed last night you said?

5     A     Yes.

6     Q     Before I really get into the

7   questioning now, I just want to talk a little bit

8   about your credentials and your work history.

9          What is your educational background?

10    A     PhD in counseling psychology achieved

11  August 2003 from Seton Hall.

12    Q     Prior to that, what school did you

13  attend?

14    A     Seton Hall.

15    Q     You were at Seton Hall as an under

16  grad also?

17    A     Yes.

18    Q     What about the terms of your

19  employment.  What was your first job after your

20  graduation from Seton Hall as an under grad?

21    A     As an under grad?

22    Q     Yes.

23    A     As an under grad I worked in

24  connection with getting my masters degree I

25  worked full-time at Seton Hall.



1

2  E L O I S E   A R C H I B A L D, one of the

3       Defendants herein, after having first

4       been duly sworn by Christina Rauh, a

5       Notary Public in and for the State of

6       New York, was examined and testified

7       as follows:

8  EXAMINATION BY

9  MR. SANDERS:

10       Q.    I want to show you yesterday's

11  previously marked Exhibit 17 which was a

12  discovery packet that was given to me by

13  the corporation counsel, Ivan Mendez, and I

14  would like to know if you've seen these

15  documents before, Dr. Archibald.

16       A.    I believe I have seen all these

17  documents before.

18       Q.    Do you know who produced that

19  file for the corporation counsel?

20       A.    I copied some if not all of

21  these records.

22       Q.    Do you know if that's the entire

23  file, Dr. Archibald?

24       A.    I cannot say that for sure

25  without comparing it to what I actually

1

2    gave the corporation counsel.  It looks

3    complete.

4         Q.    Well, the corporation counsel

5    made a representation yesterday that that's

6    the full and complete psychological file of

7    former Police Officer Nunez, and I think

8    the last time you were here I asked for

9    that file to be produced, the entire file,

10   including the front and back covers and any

11   notes there were, stickies, anything that's

12   in that file.

13             Do you remember that?

14        A.    I do not remember you saying to

15   produce the front and the back of the file.

16             MR. SANDERS:  Well, then I'm

17             going to clarify it again.

18             I'm going to make another

19             request for the same file

20             because based on what the

21             witness testified yesterday,

22             this is not a full and complete

23             file, and in addition to what

24             now Dr. Archibald is telling us,

25             she's not sure if that's the

entire file, and I'm going to

make another request.

In addition to city

producing this file, I want the

witness to come back with the

physical file so we can inspect

it here inside this conference

room to ensure that we have all

the documents to this file

because as we go through

discovery, you're going to see

there is a note in here that we

are missing a second page from.

MR. MENDEZ: Your request

will be taken under advisement,

and I'm requesting that counsel

place that request in writing

and forward it to my office.

MR. SANDERS: I'm going to

say this for the record. There

is nothing in the Federal Rules

of Civil Procedure that say you

have to place that request in

writing. This is open

discovery. I'm making the

request. Counsel is an officer

of the court.

I'm saying on the record

this is a written request

because the court reporter is

taking it down, and he's

directed to produce those

documents for my inspection, and

if he doesn't and the city

continues to do this with these

records, I'm going do ask the

court for sanctions and costs

because this is costing us more

to conclude this litigation

because we keep running into all

these interferences.

Q. You don't know if that's the

full file of Police Officer Nunez, right?

A. I know that I copied the entire

file except the front and back of the file,

but what I cannot tell you is whether or

not -- without looking through every page

which I can do, whether or not everything

1

2  that I copied is here in front of me now.

3        Q.    We're going to pick up where we

4  left off.

5              Now, have you spoken to anyone

6  since the last time we had you in here for

7  a deposition about this case other than

8  corporation counsel?

9        A.    Have I spoken to anyone about

10  this case?

11        Q.    Yes.

12        A.    Yes.

13        Q.    Who have you spoken to?

14        A.    Dr. Creagh-Kaiser.

15        Q.    When did you speak to Dr.

16  Kaiser?

17        A.    May have been about two or three

18  weeks ago.

19        Q.    Which way did it go?  How did

20  you contact her, or did she contact you?

21        A.    She called me.

22        Q.    She contacted you.  And what, if

23  anything, did you discuss?

24        A.    Whether or not -- no, I

25  shouldn't word it that way.  More